**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAVID ROGERS, ALTHEA DEMPS, RUSSELL SPAULDING, MARK FRANKLIN, CARLINE DUNLAP, | ) ) ) Case No. 2012 CV 07220 ) |
| Plaintiffs, | ) Judge Gottschall ) Presiding Judge |
| vs. | ) ) Judge Weisman |
| FORD MOTOR COMPANY, | ) Magistrate Judge ) |
| Defendant. | ) |

**PLAINTIFF DAVID ROGERS'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I. INTRODUCTION………….………..………………………….…..…………..…..2

II. STATEMENT OF MATERIAL FACTS AND LEGAL STANDARD …………...2

    Summary Judgement……………………………….…...………….…………….3

    Method of Proof…...3

III. ARGUMENT……………………….……………………………….…...4

A. Plaintiff States a Valid Claim of Race Discrimination in the Terms and Conditions of His Employment…………………………………………………………………….4

 (1) The Circumstantial Evidence of Racial Discrimination and Racial Animus Creates a Triable Issue and Renders Summary Judgment Inappropriate………………...…….4

 (2) A Prima Facie Case of Discrimination under the McDonnell-Douglas Burden Shifting Analysis is Established……………………………………………………....7

 (3) Ford Erred in Alleging that Rogers Cannot Identify Specific Instances When he was Denied Overtime and It was Because of His Race………………...…………...….9

B. Plaintiff States a Valid Claim of Retaliation………………………………...…...11

IV. CONCLUSION ……………………………………………….…..11 … 17

## **TABLE OF AUTHORITIES**

CASES

*Bennett v. Potter*,
    2011 WL 1231166 *7 (N.D. Ill., March 30, 2011)..........................................................9
*Burlington N. & Santa Fe Ry. Co. v. White*,
    548 U.S. 53, 54, 126 S. Ct. 2405, 2407, 165 L.Ed. 2d 345 (2006)......................11,15,16
*Dandy v. United Parcel Serv., Inc.*,
    388 F.3d 263, 272 (7th Cir.2004)..................................................................................3
*Kause v. Alberto-Culver Co.*,
    No. 97 C 3085, 2000 WL 875742, (N.D. Ill. June 28, 2000)..........................................8
*Lalvani v. Cook County*,
    269 F.3d 785, 789 (7th Cir. 2001)..................................................................................7
*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)..................................................3,7
*Miranda v. Wisconsin Power & Light Co.*,
    91 F.3d 1011, 1016 (7th Cir. 1996)...............................................................................3
*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75, 81-82, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)....................................16
*Payne v. Pauley*,
    337 F.3d 767, 773 (7th Cir. 2003)..................................................................................3
*Stone v. City of Indianapolis Public Utilities Div.*,
    281 F.3d 640, 644. (7th Cir. 2002)...............................................................................11
*Troupe v. May Dept. Stores Co.*,
    20 F.3d 734, 736 (7th Cir. 1994)................................................................................3,4

STATUTES

Title VII of the Civil Rights Act of 1964,
    Pub.L. 88-352, 78 Stat. 241 (1964)*, 42 U.S.C. § 2000e–2(b)* .................................2,4,8

NOW COMES Plaintiff, David Rogers, by and through his attorney, Demitrus Evans, of TEIL Firms LLC, and in response and opposition to Defendant's Motion for Summary Judgment, states as follows:

## I. INTRODUCTION

Plaintiff, David Rogers ("Rogers") began working for Defendant, Ford Motor Company ("Ford") on May 15, 1995. From 2008 to 2010, while classified as an industrial lift truck operator (ILTO) and as an hourly employee in the Material Planning and Logistics ("MP&L")[1] Department of the Chicago Assembly Plant ("CAP") of Ford, he was subjected to unfair treatment at the hands of his white managers, which included loss of overtime work opportunities based on his race. When Rogers brought his concerns of racial discrimination, to the appropriate departments heads and management individuals, no changes occurred. Subsequently, Rogers filed complaints with local and federal administrative agencies, which resulted in retaliation against him by the Defendant. Rogers, along with other African-American employees, including those listed in the case caption, filed a lawsuit against the Defendant, under Title VII of the Civil Rights Act of 1964, Pub. L. 88-352, 78 Stat. 241 (1964), for race discrimination and retaliation in the terms and conditions of their employment on September 10, 2012. Now Defendant has asked the Court for summary judgment of the Title VII complaint, alleging that Rogers lacks evidence to establish a prima facie case for his claims. For the reasons stated below, the Court should deny Defendant's motion.

## II. STATEMENT OF MATERIAL FACTS AND LEGAL STANDARDS

In addition to the facts that Plaintiff states in his Response to Defendant's Rule 56.1 Statement of Undisputed Material Facts ("SOF"), Plaintiff also relies on the facts presented in Plaintiff's Statement of Additional Facts ("SAF").

---

[1] Also known as the Material Handling Department.

2

Summary Judgment

For the nonmoving party, the opposition to the summary judgment shall be more than raise "metaphysical doubt" about the presence of a genuine issue of material fact. *Miranda v. Wisconsin Power & Light Co*., 91 F.3d 1011, 1016 (7th Cir. 1996). A self-serving affidavit is an acceptable method if "the evidence meets the usual requirements for evidence presented on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial." *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003).

Method of Proof

A plaintiff may use "direct or circumstantial evidence (direct method) or resort to the indirect burden-shifting method described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973)" to prove the discrimination. *Dandy v. United Parcel Serv., Inc*., 388 F.3d 263, 272 (7th Cir.2004). Direct evidence such as self-admission is admitted rare. *See Dandy, supra,* 388 F. 3d at 272.

With respect to the circumstantial evidence, the *Troupe* court opined that three types of circumstantial evidence can be distinguished:

> "The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. *[citation omitted]*. This is the most common type of evidence in an intentional discrimination case, now that employers have taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written. Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. *[citation omitted]*. And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or

3

replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. *[citation omitted]*. Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

### III.   ARGUMENT

A. <u>Plaintiff States a Valid Claim of Race Discrimination in the Terms and Conditions of His Employment</u>.

Title VII prohibits an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. *See 42 U.S.C. § 2000e–2(a)*. It also prohibits an employer from limiting, segregating or classifying his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race. *See 42 U.S.C. § 2000e–2(b)*.

(1) <u>The Circumstantial Evidence of Racial Discrimination and Racial Animus Creates a Triable Issue and Renders Summary Judgment Inappropriate</u>.

Courts have recognized that nowadays "employers have taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written." *See Troupe*, 20 F.3d at 736. However, the record here contains circumstantial evidences, which in combination creates triable issues of discrimination.

To begin with, from 2008 to 2010, among ten of Ford's supervisory employees at the record, who were in the reporting line of the Plaintiffs, eight were Caucasians, one was Hispanic, and one was African-American. [Tab 11, Ford's Answer to Interrogatories 2, SAF Para. 22]. Two of Rogers's supervisors were John Grzych ("Grzych") and Williams Rentschler ("Rentschler", also called as "Bill"). [Tab 1, Rogers Dep. 57: 9-19; SAF Para. 19]. Rogers's

4

Committeeman from the Union was George Butler ("Butler"). [Tab 1, Rogers Dep. 28:16-19; SAF Para. 7]. In order to make a grievance Rogers had to go through Butler. [Tab 1, Rogers Dep. 27:15-19; 28:2-16; SAF Para. 7-8]. Butler was repeatedly informed about lack of overtime for African Americans, but would not file the grievances and always said that the grievances were "unwinnable" as to overtime and would then "sweep them under the rug." [Tab 3, Demps Dep. 54:16- 55:7;SAF Para. 9]

In 2008, there was a scheduled layoff period in which Ford went down it shifts and had the MP&L department working for two (2) weeks on and then two (2) weeks off. [Tab 1, Rogers Dep. 42:17-22; SOF Para. 38,45]. During the off time, Rogers decided to go into the plant to see what was happening. [Tab 1, Rogers Dep. 76:7-14; SOF Para. 38,45]. He saw other similarly situated Caucasian employees working overtime. [*Id.*]. Rogers asked Rentschler if Rentschler would like for Rogers to work overtime on the week of August 4th, 2008. [Tab 1d, Rogers Dep. Ex. 10, No. 03762; SAF Para. 1-2]. Rentschler rejected the offer and stated, as a reason, that he did not "pay anyone for laying down on the job". [*Id.*]. This statement was *a mere pretext of discrimination*. It was discriminatory and derogatory, given that Caucasian employees such as Edward Ernst had obtained weekday overtime opportunities. [Tab 1, Rogers Dep. 170:8-11; SAF Para. 4]. The statement also drew the inference that Rentschler was motivated by the stereotypical impression that Black employees "laid down on the job" or that Black's employees were lazy. Besides the negative connotations, Rentschler's statements had to do with job performance which was not supported by "Local Agreement Overtime Equalization" in the Bargaining Agreement effective on May 23, 2009 between the Union and Ford ("Agreement") for overtime decisions. [Tab 1a, Rogers Dep. Ex. 6; SAF Para.1;SOF Para 2]. In Ford's Answers to Plaintiff's' First Set of Interrogatories, Ford admitted that job performance is not supposed to

5

be used as a factor in the assignment of overtime. [Tab 11, Ford's Answer to Interrogatories 4; SAF Para.4].

This was one display of racial animus towards African Americans, but there were others. Carline Dunlap ("Dunlap"), one of Plaintiffs of this complaint, was denied overtime by Rentschler. [Tab 10, Dunlap Dep. 145:11-22; SAF Para. 4]. When Dunlap asked him, "Why would you put somebody else on my job without first asking me?" He told Dunlap that he could "put whoever he wanted to put on that job." [Tab 10, Dunlap Dep. 145:22-146:03; SAF Para. 4].

On August 13, 2008, Rogers overheard Rentschler say to supervisor Julian Ledezma "don't forget to pull the Black one off," which was followed by another supervisor, Paul D'Annunzio's, laughing. [Tab 1g, Rogers Dep. Ex. 14, page 2; SOF Para 57]. Shortly after the occurrence, Rogers talked with the head of the Labor Relations department, Terrance McClain ("McClain"), about the racial animus. [Tab 1, Rogers Dep. 91:13-17; SAF Para. 15]. McClain commented that he knew the department was *racial* but Rogers had to deal with it. [Tab 1, Rogers Dep. 92:5-7; SAF Para. 15].

Moreover, the City of Chicago Commission on Human Relations ("CCHR") found substantial evidence of race discrimination at Ford and issued an investigation summary on its findings in May 2010. [Tab 4, CCHR Inv. Sum. page 9; SOF Para 43, SAF Para 6]. To CCHR, Ford responded by filing a Motion to Dismiss for Lack of Jurisdiction on March 4, 2011, which was reluctantly granted by the CCHR after it commented that Ford had *waited for almost a year* to bring up jurisdiction. [Tab 12, CCHR Dismissal Order, SAF Para. 23]. In the investigation summary, the CCHR provided a chart that summarized the overtime hours worked by ILTO between January 1, 2008 and September 1, 2008. [Tab 4, CCHR Inv. Sum. P. 7; SAF Para. 23].

6

After comparing the data[2] it received from Ford, CCHR found that eleven (11) white ILTOs worked 290.3 hours, 77% of a total of 378.4 overtime hours. [Tab 4, CCHR Inv. Sum. P. 8; SAF Para. 23].

The Equal Employment Opportunity Commission's ("EEOC") April 12, 2012 determination mirrored the CCHR's investigation summary. [Tab 13, EEOC Determination; SAF Para. 23]. The EEOC found that "evidence obtained in the investigation established reasonable cause to believe that the Charging Party and a class of Black employees[3] have been denied overtime opportunities because of their race, Black, in violation of Title VII." [Tab 13, EEOC Determination; SAF Para. 24].

In combination, these material facts comprise evidence of discrimination creating a triable issue.

> (2) A Prima Facie Case of Discrimination under the *McDonnell-Douglas* Burden Shifting Analysis is established.

Contrary to Ford's assertions, Rogers is able to meet his burden of establishing a prima facie case of discrimination.

To establish a prima facie case of racial discrimination under the *McDonnell Douglas* burden shifting approach, a plaintiff is required to demonstrate that (1) he was a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) similarly-situated employees not in the protected class were treated more favorably. *Lalvani v. Cook County*, 269 F.3d 785, 789 (7th Cir. 2001).

---

[2] The numbers provided by Ford on the subject were inconsistent from document to document so CCHR selected the highest numbers. *See footnote at Tab 4, CCHR Investigation Summary, p. 7; SAF Para.23]*

[3] Carline Dunlap was listed as the Charging Party but Rogers declared that EEOC indicated only one complaint's name needed to be on the list so a class of Black employees included Rogers. *See Tab 2, Rogers's Affidavit 34; SAF Para.24*

    a.   Protected Class.

Rogers is African American and a member of a protected class under Title VII.

    b.   Meeting Employer's Legitimate Performance Expectations.

Rogers performed his job to his employer's satisfaction. There was no record that Rogers was ever accused of failing to complete his assignments.

    c.   Adverse Employment Action

The denial of overtime opportunities had a tangible economic effect on Rogers, an hourly employee, because it reduced his pay. *Kause v. Alberto-Culver Co.*, No. 97 C 3085, 2000 WL 875742, at *6 (N.D. Ill. June 28, 2000). So, the denial of overtime was an adverse employment action under Title VII. *Id*.

    d.   Different Treatment

If a jury looked at the overtime equalization sheets[4], it would find that other similarly-situated employees outside of Plaintiff's' protected class were treated more favorably by Ford. Using Edward Ernst ("Ernst") as an instance, he was a Caucasian employee and classified as ILTO at the same department with the Plaintiffs. [Tab 14, KMN to Wassell with classifications, page 2]. On Overtime Equalization Report CAP 06-01-2008, Ernst and Rogers both worked the 3rd shift while it showed Ernst's prior week overtime hours were 1.5 hours. [Tab 15, OT Rept. 06-01-2008; SAF Para.3]. The following week, the Overtime Equalization Report CAP 06-09-2008 showed Ernst's prior week overtime hours were 3 hours while most employees had 0

---

[4] The Plaintiffs knew that some of the overtime equalization sheets were not a true reflection of who would receive overtime opportunities, because foremen, Gary Rankins and Julian Ledenon were caught altering the overtime equalization sheets in 2012. [*Tab 3, Demps Dep. 131: 9-15; SAF Para. 1-2*]. During the CCHR investigation, Ford was asked to present payroll records that would show whether an individual worked weekend overtime, but Ford said that the requested information was no longer available. [*Tab 4, CCHR Inv. Sum. page 8*].

8

overtime hours. [Tab 15, OT Rept. 06-09-2008; SAF Para.3]. Even if Ford would argue Ernst had higher seniority, which was not even a year older than Rogers, Ernst should not receive overtime hours consecutively. If Ford followed the Agreement, after Ernst received overtime hours at the week of May 25, 2008, it would be the next senior ILTO who had fewer overtime hours obtained the opportunity at the week of June 1, 2008.

As mentioned above at page 5, in 2008, Rogers found, via the sign-in sheets and conversation with other employees, including other plaintiffs on this complaint heading, that only Caucasian employees worked during the layoff period. [Tab 1, Rogers Dep. 42:17-22, 81:1-17, 82:21- 83: 13; Tab 2, Rogers's Affidavit para 22-23; SAF Para. 1-2].

Thus, other similarly-situated Caucasian ILTOs were treated better than Rogers.

(3) <u>Ford Erred in Alleging that Rogers Cannot Identify Specific Instances When He was Denied Overtime and It was Because of His Race</u>.

Ford argued that Rogers could not point out the specific instances that he was denied overtime because of his race. [Doc. #214, Defendant's Memorandum, p. 4 to 7]. Ford also cited case *Bennett v. Potter*, arguing that the summary judgment was granted because the plaintiff did not "make a single specific allegation concerning the denial of overtime, such as a date on which she requested overtime and was denied." [Doc #214, Defendant's Memorandum, page 5]; 2011 WL 1231166 *7 (N.D. Ill., March 30, 2011). In *Bennett*, the plaintiff's manger was "only asked about a single instance" on July 24 of 2008, which was later clarified she had not actually requested to work overtime. *Bennett*, 2011 WL 1231166 at *2.

In contrast, in the case at the bar, there were two types of overtime at Ford: weekend and weekday. For weekday overtime, the primary operator is offered the opportunity first. [Tab 1, Rogers Dep. 56:4-11; SAF Para. 4]. If the primary operator is not available or refuses weekday

9

overtime then the other employees may verbally initiate the request to work, or the supervisor may ask them if they want to work. [Tab 1, Rogers Dep. 56:15-17]. Rogers recalled an instance, on Friday, August 8, 2008, in which he requested to work and Rentschler denied him the opportunity. [Tab 1d, Rogers Dep. Ex. 10, No. 03762].

On the other hand, weekend overtime was supposed to have a different, more calculated and equalizing process. According to the Agreement between Ford and the Union, in order to receive weekend overtime opportunities, the employees had to sign up first, by putting their name in the opt-on book, which would be deemed as requesting overtime. [Tab 1a, Agreement, para. 7]. Then weekend opportunities should be given to more senior employees who have less overtime. [Tab 1a, Agreement, para. 2; Tab 16, Grzych Dep. 31:8-13]. However, Ford, especially the supervisors in the MP&L department, did not follow the Agreement. [SAF Para. 1-2] The Agreement stated that every quarter there was supposed to be a sign-up for weekend overtime opportunity and everyone's previous overtime returned to zero. [Tab 1a, Agreement Para. 3]. Instead, the MP&L department only posted sign-ups twice a year, instead of four times a year. [Tab 16, Grzych Dep. 41: 5-12]. In practice, overtime equalization in the MP&L department did not differentiate from weekday to weekend, despite the Agreement, instead, it was all the same, with a racial disparity. [Tab 3, Demps Dep. 51:4-14; SAF Para. 1-2].

Rogers signed up on the opt-on books for both the second shift and the third shift. [Response to SOF 35 - Tab 6, OT Sign-Up]. But pursuant to the Timekeeping System Report of Rogers from August 20, 2006 to August 31, 2008 ("Report"), his weekend overtime hours were always zero (0). [Response to SOF 35 - Tab 7, TSR Rogers]. Grzych, in his deposition corroborated Rogers's testimony, by specifically recalling that Rogers inquired as to "when would he (Rogers) would be getting the chance for overtime." [Tab 16, Grzych Dep. 29:10-15].

If Rogers were getting overtime there would be no reason for Rogers to inquire, nor for Grzych to recall this fact.

Furthermore, Ford stated that Rogers declined overtime from time to time. [Doc. # 214, pg. 6]. However, before Rogers filed his CCHR complaint in August of 2008, the end of the Report presented that "overtime refused" was zero (0). [Tab 7, TSR Rogers pg. 10].

B. <u>Plaintiff States a Valid Claim of Retaliation</u>

It is unlawful for an employer to discriminate against an employee because he "has opposed any practice made an unlawful employment practice … or because he has made a charge, testified, assisted, or participated in any matter in an investigation proceeding, or hearing …" *42 U.S.C. § 2000e-3(a)*. The anti-retaliation provision is not limited to actions affecting employment terms and conditions. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54, 126 S. Ct. 2405, 2407, 165 L. Ed. 2d 345 (2006). The U.S. Supreme court applied the *objective standard* and ruled that a retaliation plaintiff should show that the challenged action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Id*. [*quotation omitted*]

A plaintiff may establish a claim of retaliation by direct evidence that he engaged in protected activity, and as a result, suffered the adverse employment action for which he complaints. *Stone v. City of Indianapolis Public Utilities Div*., 281 F.3d 640, 644. (7th Cir. 2002). In order to establish retaliation through indirect means, a plaintiff must show that (1) he engaged in a protected activity; (2) that he was subjected to an adverse employment action; and (3) that he was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. *See Id*. If the defendant presents evidence of a noninvidious reason and it is contested, there must be a trial. *See Id.*

11

Relying on the direct evidence and indirect proof, Rogers has offered sufficient evidence to prove that, if viewed in the light most favorable to the nonmoving party, Ford retaliated against Plaintiffs as a group, including Rogers individually, in violation of Title VII.

First, Rogers engaged in a protected activity. He, along with other Plaintiffs filed a complaint at Ford by submitting a letter to the Labor Relations department. [Tab 1b, Rogers Dep. Ex. 8]. Rogers also filed a complaint with the CCHR on August 25, 2008. [Tab 1c, Rogers Dep. Ex. 9]. Plaintiffs, as a group, went to the EEOC together to file a complaint on August 28, 2008, but were told that they should have one person to act as representative for their claims against their employer. [Tab 2, Rogers's Affidavit para 33; Tab 1, Rogers Dep. 144:18-22; Tab 3, Demps Dep. 44:13-20].

Second, Rogers suffered adverse employment action and Ford did not have a legitimate reason for taking the adverse actions against Rogers. In the most blatant example of direct evidence of retaliation, on September 5, 2008, at approximately 4:20 pm to 4:40 pm, when Rogers was working at his dock as usual, a noose was hung on his rack to intimidate him. [Tab 1f, Rogers Dep. Ex. 13]. He knew that the noose was hung for him, because when he first put the car parts on the rack it was not there. [Tab 1, Rogers Dep. 122:21-123:2]. However, he went to get other parts and then came to a shock: there was "a rope hanging on top of the same rack, in a shape of a noose." [Tab 1, Rogers's Dep. 119:4-23; Tab 2, Rogers's Affidavit para 41- 46; Tab 1d, Rogers Dep. Ex. 10 No. 03765; SAF Para. 17-18]. This noose incident was approximately five (5) weeks after the African-American employees filed their complaints, thus Rogers understood that it was hung there as intimidation for filing the complaints about the discrimination and overtime issues. [Tab 2, Rogers Affidavit para 36- 46; Tab 1f, Rogers Dep. Ex. 13; SAF Para.17].

Ford's SOF cited Rogers's Deposition and concluded that Ms. Becky Black, an African American Supervisor, "said it looked like a piece of rope had simply fallen off some stock, or something to that effect. [Doc. # 215- main SOF 61]. However, the deposition related to this conclusion was presented as below:

Q. What was her response when you showed her the item?
A. I don't remember right at the time. I don't remember now.
Q. Do you recall that she told you that it was just something that had come off stock?
A. Yeah, she said something to that effect.

In Rogers's affidavit he explained that he gave his lawyer his journal notes and asked for them before the deposition so he could have reminders of all the incidents, but the lawyer did not bring his notes to the deposition. [Tab 2, Rogers Affidavit para 48 to 49]. However, after Rogers complained to Natalia Dahringer ("Dahringer") of Labor Relations at Ford, she drafted, for record of the conversation with Rogers, a summary statement dated September 19, 2008. [Tab 1f, Rogers Dep. Ex. 13]. It discusses facts related to the noose given at the time when Rogers still had a fresh memory about his conversation with Ms. Black. Dahringer wrote that Rogers recalled that "Becky Black and Cornell Howard happened by on a buggy. I asked them to confirm what they saw. They agreed it was a noose. Becky said to me, 'calm down and don't take it personally.'" [Tab 1f, Rogers Dep. Ex. 13; SAF Para. 18]. To Rogers's understanding, Ms. Black knew it was a noose and was trying to calm him down because he was extremely upset as it brought to his mind a time in American history when Caucasian Americans lynched black men and women for talking or just for fun. [Tab 2, Rogers's Affidavit para 46]. In the SOF, the defendant attempts to utilize Roger's lack of memory about the conversation during the 2014 deposition, six (6) years after the incidents, to conclude that Ms. Black did not think it was a

noose, without referring to the other documented records that stated what Ms. Black actually said to corroborate this conclusion. This was misleading and a pretext.

In fact, Rogers's journal notes during the time of the incident, dated on September 5 of 2008, indicated that several people witnessed the rope and agreed with him that it was a noose. [Tab 1d, Rogers Dep. Ex. 10 No. 03765; Tab 1f, Rogers Dep. Ex. 13; SAF Para. 18-19]. Althea Demps ("Demps"), who was employed at Ford since January 11,1995 and became an ILTO at the blue dock in or around 2007, went to see what everyone was discussing about a noose, saying it was all the buzz [Tab 3, Demps Dep. 110:8-10]. After viewing it, she said that the rope was not used to secure stock in the MP&L department and that she had never seen it on stock that came in. [Tab 3, Demps Dep. 21:20-22, 28:13-22, 29:5-14, 111: 23-24, 112: 1-14; SAF Para. 7-20]. Demps further testified under oath that after she saw it she could hear Rogers, who was extremely upset, and Rentschler arguing about how the department was going to handle it. [Tab 3, Demps Dep. 111: 1-9; SAF Para. 17]. So there was no question that it was actually a noose. [Tab 1e, Rogers Dep. Ex. 12; SAF Para. 18].

It is also clear that not much was done in the department about the situation. In a footnote of its Memorandum, Ford claimed that it acted reasonably in response to the noose incident that Roger's claimed as retaliation. [Doc #214, Ford's Memorandum, pg. 10, footnote 6]. Yet, Dahringer testified that she took statements from other people, but she never produced those statements. [Tab 9, Dahringer Dep. 40: 14-16]. She could not recall her conversations with Cornell Howard or other people. [Tab 9, Dahringer Dep. 41: 18-24.] No conclusory reports were submitted for discovery nor as part of the SOF. Neither was there indication that there was a memo that was distributed, recitation of any anti-discrimination policy, sensitivity training, department meeting, discussion, etc.

14

Besides the noose, after the Labor Relations, CCHR, and EEOC complaints were filed, the retaliation experienced by African-American employees in the MP&L department became target of constant harassment. The department environment became stressful and as the plaintiffs, including Rogers, felt intimidated by the supervisors. The Plaintiffs were watched extremely closely by the supervisors in ways that they had never done so before and they were repeatedly told what to do and rushed as if they were children. [Tab2, Rogers's Affidavit para 40; Tab 3, Demps Dep. 152:2-8; SAF Para. 12-14]. Rogers recalled that after he filed his complaints, the monitoring from the supervisor increased from 0 to 6 times per shift. [Tab 2, Rogers Affidavit para 40; SAF Para. 15-16]. Demps testified that not only did the supervisors stand around staring with their arms crossed, but they would continuously come by them and rush them in their work by saying "is that truck done yet?" and then knowing that it was not completed, come back and say "is it complete?" [Tab 3,Demps Dep. 104:1-23; SAF Para. 13-16]. When they actually completed a truck, the supervisors would not allow them to take breaks, as was customary, but would say "do this!" "do that!" [Tab 3, Demps Dep. 107:3-12; SAF Para. 13-16]. The work that the supervisors wanted them to do would be others work and they would be told to assist others and not take their breaks. [Tab 3, Demps Dep. 108:20-24; SAF Para. 10-16]. The harassment from the supervisors started about five weeks after the charges were filed regarding overtime discrimination. [Tab 3, Demps Dep. 104:16-23; SAF Para. 15].

In its Memorandum, Defendant summarized that Rogers had three allegations related to his retaliation claim, which were argued one by one and was concluded that none of them can show an adverse employment action. [Doc. # 214, page 9]. However, in *Burlington Northern*, the Supreme Court opined that "the significance of any given act of retaliation will often depend upon the particular circumstances" so context matters. *Burlington N. & Santa Fe Ry. Co.*, 548

U.S. at 69, 126 S. Ct. at 2415. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id*., quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). Similar to *Burlington Northern*, here, the impact of the workplace behaviors discussed above depends on a constellation of surrounding circumstances. Considering all the evidences together, a jury can find that the impact of those behaviors would dissuaded an employee from making a charge of discrimination.

  Defendant further argued that the supervisors would not have been retaliating against Rogers, because they would not even had known and been unable to make a connection that Rogers had filed a complaint, because the EEOC only listed Dunlap as the charging party. [Doc #214, Ford's Memorandum, pg. 9]. Disregarding the reason that Dunlap was listed as the charging party, which has already been mentioned above and in Rogers' affidavit, Dunlap listed Rogers and other plaintiffs as witnesses in the EEOC files and Ford's Management would have either read and/or been briefed on the complaint and /or should have known about a discrimination complaint in their department. [Tab 8, EEOC files; SAF Para 24]. Even though EEOC listed Dunlap's name only, Rogers also filed a complaint with the CCHR under his name. [Tab 1c, Rogers Dep. Ex. 9; SAF Para.23]. Besides being aware of the overtime discrimination through the complaints, the supervisors knew that Rogers had been complaining about the overtime issue. [Tab 5, Decl. Christina Peace, attachment; SAF Para. 2, 4-6]. Defendant Ford's argument of a lack of retaliation is simply not supported.

  If the factual instances of harassment are taken in combination a prima facie case of retaliation claim is established.

## IV. CONCLUSION

In conclusion, Plaintiff David Rogers has presented evidence to allow a reasonable jury to return a verdict in his favor on his claims. There are genuine issues of material facts and Defendant's motion for summary judgement fails.

WHEREFORE, Plaintiff David Rogers prays that this Honorable Court deny the Defendant's motion for summary judgment and permit Plaintiff to present his claims to a jury.

                Respectfully Submitted,

                */s/ Demitrus Evans*
                Demitrus T. Evans, ARDC # 6242859

                TEIL Firms LLC
                10330 W. Roosevelt Rd, Suite 204,
                Westchester, IL 60154
                708/531-1740
                devans@TEILfirms.com

### CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2017, the foregoing was filed with the Court using the ECF system and a copy was served on counsel of record listed below by electronic means:

| | |
|---|---|
| Kathleen M. Nemechek ARDC #50139 | Mark H. Boyle ARDC #6200934 |
| Jocelyn A. Villanueva Admitted PHV | Karen Kies DeGrand ARDC #6191140 |
| BERKOWITZ OLIVER LLP | Donohue Brown Mathewson & Smyth LLC |
| 2600 Grand Boulevard, Suite 1200 | 140 South Dearborn Street, Suite 800 |
| Kansas City, Missouri 64108 | Chicago, Illinois 60603 |
| Telephone: (816) 561-7007 | Telephone: (312) 422-0900 |
| E-Mail: knemechek@berkowitzoliver.com | E-Mail: karen.degrand@dbmslaw.com |
|     jvillanueva@berkowitzoliver.com |     mark.boyle@dbmslaw.com |

Attorneys for Defendant Ford Motor Company

                /s/ Demitrus Evans