# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DAVID ROGERS, ALTHEA DEMPS, RUSSELL SPALDING, MARK FRANKLIN, and CARLINE DUNLAP,[1] | )<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) No. 12 C 7220 |
| FORD MOTOR COMPANY, | ) Judge Joan B. Gottschall |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff David Rogers ("Rogers") contends that his employer, Defendant Ford Motor Company ("Ford"), discriminated against him and subjected him to a hostile work environment because of his race (African American). Rogers further contends that Ford retaliated against him because he complained about the discrimination. Ford has filed a motion for summary judgment, seeking summary judgment on the claims brought by Rogers.

Ford argues that Rogers lacks sufficient evidence to establish a prima facie case of discrimination. Ford contends that Rogers has failed to identify specific occasions when he was denied overtime and that Rogers has not pointed to sufficient evidence that shows that he was denied overtime because of his race. Ford also contends that Rogers cannot establish a prima facie case of retaliation. Ford argues that Rogers has failed to show that he suffered an adverse

---

[1] The parties' filings in this matter and the underlying Equal Employment Opportunity Commission ("EEOC") charge inconsistently refer to both Carline and Caroline Dunlap ("Dunlap"). The court adopts the "Carline" spelling used in the caption and text of the first amended complaint.

action and has failed to point to sufficient evidence to show that any adverse action was retaliation because of a protected activity. For the following reasons, Ford's motion for summary judgment is denied in its entirety.

## I.  BACKGROUND

Rogers began working for Ford in 1995. In April 2008, Rogers became classified as an industrial lift truck operator ("ILTO"). As an ILTO, Rogers worked for several supervisors, including Bill Rentschler ("Rentschler") and John Grzych ("Grzych"). Rogers contends that although he requested overtime, his requests were denied and that overtime was instead given to Caucasian co-workers. According to Rogers, his supervisors discriminated against him and against his African American co-workers in a similar fashion. Rogers and his African American co-workers filed complaints with the Ford Labor Relations Department regarding the alleged discrimination. Rogers also filed a complaint with the Chicago Commission on Human Relations. In August 2008, Rogers and his African American co-workers also went to the EEOC to file a complaint. Dunlap was chosen to act as the representative and charging party at the EEOC.

Rogers contends that after making the complaints about discrimination, he was retaliated against at work. According to Rogers, after filing the complaints, African American ILTOs were rushed, were closely scrutinized, and were loaded with more work by supervisors as part of an effort to make their jobs more difficult and to harass them. On September 5, 2008, Rogers allegedly returned to his work station and found what he believed to be a noose hanging from his

work station. Rogers understood the noose to be connected to his race and an attempt to intimidate and threaten him.

Plaintiffs include in their amended complaint claims alleging discrimination and retaliation in violation of 42 U.S.C. § 1981 ("Section 1981") brought by all Plaintiffs (Count I), claims alleging race discrimination in violation of the Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* brought by all Plaintiffs (Count II), Title VII hostile work environment claims brought by all Plaintiffs (Count II), Title VII retaliation claims brought by all Plaintiffs (Count II), and a breach of settlement agreement claim brought by Dunlap (Count III). On August 4, 2017, this court adopted the magistrate judge's Report and Recommendation and dismissed all claims brought by Plaintiff Mark Franklin without prejudice for lack of prosecution. [212]. On September 14, 2017, the court granted the motion by the bankruptcy estate of Russell Spalding ("Spalding") to dismiss all of Spalding's claims with prejudice. [218]. On November 16, 2017, the court granted the motion by the bankruptcy estate of Althea Demps ("Demps") to dismiss Demps' claims with prejudice. [233]. In regard to Dunlap, the record reflects that the trustee of the bankruptcy estate of Dunlap reported to the magistrate judge that he has settled Dunlap's claims with Ford. [191]. Rogers' claims are thus the only remaining claims in the instant action. Ford now moves for summary judgment on Rogers' claims.

## II. ANALYSIS

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party's burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

    A.  Race Discrimination Claims

Ford moves for summary judgment on the race discrimination claims. Ford argues that Rogers has failed to identify specific occasions when he sought overtime and his requests were refused. Ford also argues that Rogers has failed to show that any decision to deny Rogers overtime was made based on Rogers' race. Title VII provides in part that "[i]t shall be an unlawful employment practice for an employer-- . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981. Courts generally apply the same analysis to

4

Title VII and Section 1981 discrimination claims. *Lane v. Riverview Hosp.*, 835 F.3d 691, 695 (7th Cir. 2016) (stating that the Court "analyze[s] Title VII and § 1981 claims under the same framework").

In *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit "held that the 'direct' and 'indirect' methods should no longer be treated as distinct legal standards." *Golla v. Office of Chief Judge of Cook Cty., Illinois*, 875 F.3d 404, 407 (7th Cir. 2017) (stating that "[i]nstead of separating evidence under different methods of proof, [the Court] held that [e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence") (internal quotations omitted) (quoting *Ortiz*, 834 F.3d at 765). The ultimate question at the summary judgment stage in a Title VII race discrimination case is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the . . . adverse employment action." *Golla*, 875 F.3d at 407 (internal quotations omitted) (quoting *Ortiz*, 834 F.3d at 765). Nonetheless, the *McDonnell Douglas* burden-shifting method of proof "remains a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Golla*, 875 F.3d at 407 (internal quotations omitted) (quoting *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)); *see also Austin v. City of Chicago*, No. 14-CV-9823, 2018 WL 1508484, at *6 (N.D. Ill. Mar. 27, 2018) (explaining that "[t]he Seventh Circuit's decision in Ortiz . . . did not alter the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)").

1.  Specific Incidents of Discrimination

Ford contends that Rogers has not identified any specific incidents of racial discrimination. Ford also argues that the specific instances of discrimination referenced in Rogers' affidavit in support of his response to Ford's motion for summary judgment ('Rogers Affidavit") should be disregarded as self-serving allegations that are inconsistent with his deposition testimony.

a.  Ability to Recall Denial of Overtime

Ford contends that Rogers' discrimination claims are based on a failure to receive overtime and that Rogers is unable to recall specific instances when he was denied overtime. In support of its position, Ford points to Rogers' deposition testimony. Rogers was asked at his deposition about when he was denied overtime on weekdays. Rogers indicated that he did not "have specific dates." (Rogers Deposition Transcript "Rogers Dep." at 56–57). Rogers insisted that although he could not recite specific dates, the discrimination happened "frequently." (Rogers Dep. at 57). Rogers was later asked during his deposition about the denial of overtime on weekends and Rogers again indicated that he could not give specific dates when it occurred. (Rogers Dep. at 70). Rogers now explains that although he indicated that he could not recall specific dates during his deposition, he could have listed some dates if he had consulted his notes. A plaintiff's discrimination case is not entirely dependent upon his ability to memorize and recall dates off the top of his head at his deposition. Rogers indicates that he has a third grade education and he had no reason to understand that he was committing a grievous error in his case because he could not recite dates of alleged discrimination at his deposition. It is not

6

clear if he even know he could ask to consult his notes at that juncture in his deposition when he was asked the above questions.

The facts in this case also present a situation that might naturally evoke the responses above, because according to Rogers, there were not a few specific isolated incidents to recall. As Rogers indicated at his deposition, he believed that the denial of overtime occurred "frequently." (Rogers Dep. at 57). Ford's counsel never sought to clarify what Rogers meant by frequently. Ford also contends that there is evidence indicating that Rogers had his notes available during the deposition, but, even if this were true, that did not mean that Rogers consulted the notes when asked for specific dates of discrimination.

The fact that Ford focuses upon the above-referenced deposition responses in isolation is also misleading in light of the fact that the record contains evidence indicating when alleged discrimination occurred. There is evidence showing that Rogers requested overtime and when he requested overtime. Rogers' supervisor, John Grzych ("Grzych") acknowledged at his deposition that he specifically recalled Rogers asking when he would be getting the chance for overtime, but he could not recall the specific dates when he inquired. (Grzych Deposition "Grzych Dep." at 29). A review of Rogers' notes, which are an exhibit to his deposition, indicate when alleged discrimination occurred. While Rogers' notes do not contain specific single dates, they do reference specific weeks when Rogers claims that he was denied overtime.

There is no rule that requires a plaintiff to give a specific single date of discrimination to establish a prima facie case. Ford cites *Conley v. Vill. of Bedford Park*, 215 F.3d 703 (7th Cir. 2000) for the proposition that a "[p]laintiff must set forth *specific times* when overtime was wrongfully denied." (Ford Reply in Support of Summary Judgment ("Reply") Dkt. No. 226 at 2)

(emphasis in original). In *Conley*, the Court stated no such black letter rule relating to the need to produce specific dates of discrimination to state a prima facie case of discrimination. The court in *Conley* merely noted during its analysis of several facts that the plaintiff did not "set forth any specific times" when others were given overtime and he was denied overtime. *Id.* at 711. To defeat a defendant's motion for summary judgment, a plaintiff must simply point to sufficient evidence to enable a reasonable fact finder to find in his favor. The weeks identified by Rogers in his journal notes give ample notice to Ford as to the time in question. In addition, in regard to seeking weekend overtime, Rogers points to evidence in the record showing that he applied for overtime on the designated Opt-on books that were made available at certain times during each year and that the Ford timekeeping system shows that he received no weekend overtime. (P. Tab 6: Dkt. No. 221-14); (P. Tab 7: Dkt. No. 221-15). The record includes a copy of the Opt-on books with Rogers' signature on them. (P. Tab 6). For example, the Opt-on books show that Rogers signed up to bid for overtime on May 20, 2008. (P. Tab 6). The document is Ford's document and Ford should be able to cross-reference other overtime records. Yet Ford offers no evidence to show that Rogers was offered overtime or evidence to contradict Rogers' assertion that he did not receive such overtime and that the overtime was instead given to a Caucasian employee.

### b. Self-Serving Affidavit

Ford argues that the Rogers Affidavit should not be considered by the court because it presents new facts regarding incidents of discrimination that are self-serving and that contradict his deposition testimony. Ford contends that the Rogers Affidavit is a sham affidavit. The court

in *Conley*, which was cited by Ford, referenced *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054 (7th Cir. 1994) for the proposition that "[s]elf-serving assertions without factual support in the record will not defeat a motion for summary judgment." *Id.* (internal quotations omitted). In the instant action, however, Rogers has provided more than self-serving allegations. Rogers has provided his journal notes and copies of the Opt-on books with his signatures on them. In addition, Rogers has provided his affidavit, which contains dates. Rogers indicates, for example, consistent with his journal notes, that during the week of August 4, 2008, he asked Rentschler if he could get weekday overtime and his request was denied for a reason that was not consistent with Ford's overtime allocation procedures. (P. Tab 1d: Dkt. No. 221-6 at 4). Such evidence is based on Rogers' personal observations and is not merely speculation.

Rogers has also produced notes indicating that during the week of May 7, 2008, he complained to the head of Labor Relations Department and that, as a result, he was offered overtime work during his break that week. (P. Tab 1g: Dkt. No. 221-9); (Rogers Affidavit "Rogers Aff." Dkt. No. 221-10 ¶ 37). Rogers claims that the following week of May 12, 2018, his supervisors returned back to their discriminatory practices and weekend overtime was given to Caucasian employees and not to African American employees. (P. Tab 1g). Rogers further asserts that on the weekend of May 19, 2018, the same discriminatory treatment occurred again. (P. Tab 1g). If Ford desired to dispute such facts with evidence of its own as to such time periods, Ford could have done so, but Ford presented no such evidence in support of its motion for summary judgment.

Ford also fails to acknowledge more recent case law that recognizes a shift in regard to what would be deemed self-serving affidavits. Subsequent to *Conley* and *Jones*, the Seventh Circuit examined the "circuit's flirtation with a doctrine that allow[ed] judges to disregard self-

serving statements, and it overrule[d] any precedents that so much as hinted in that direction." *Sanders v. Melvin*, 873 F.3d 957, 960 (7th Cir. 2017) (explaining that "*[e]verything* a litigant says in support of a claim is self-serving, whether the statement comes in a complaint, an affidavit, a deposition, or a trial" and "[y]et self-serving statements are not necessarily false; they may be put to the test before being accepted, but they cannot be ignored") (emphasis in original); *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 814 (7th Cir. 2017)(stating that "[s]elf-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment" and that the Court has "tried often to correct the misconception that evidence presented in a 'self-serving' affidavit is never sufficient to thwart a summary judgment motion") (internal quotations omitted) (quoting *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 459–60 (7th Cir. 2014) and *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003)). Even if Rogers' declaration could be deemed self-serving, it is a legitimate basis to create a genuinely disputed fact at the summary judgment stage.

Ford also cites *Truly v. Sheahan*, 135 F. App'x 869, 871 (7th Cir. 2005) for the proposition that a "party cannot contradict earlier sworn testimony with sham affidavits." (Reply at 4). Generally, the Seventh Circuit "does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony" *Dunn v. Menard, Inc.*, 880 F.3d 899, 910–11 (7th Cir. 2018) (internal quotations omitted) (quoting *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996)); *see also Abraham v. Washington Grp. Int'l, Inc.*, 766 F.3d 735, 741 (7th Cir. 2014) (stating that a "sham affidavit" is "a descriptive term used to describe an affidavit that directly contradicts prior deposition testimony and therefore is considered generally insufficient to create a genuine issue of fact for

trial, unless the contradiction is adequately explained") (internal quotations omitted) (quoting *Yahnke v. Carson*, 613 N.W.2d 102, 109 (Wis. 2000)).

In the instant action, Ford has not shown that the Rogers Affidavit directly contradicts his earlier deposition testimony or that it is a sham affidavit. To be directly contradictory, Rogers would have needed to assert at his deposition that there were no instances of discrimination and then assert in his affidavit that there were instances of discrimination. In fact, Rogers asserted at his deposition that the discrimination occurred "frequently." (Rogers Dep. at 57). If Ford's counsel did not pursue the meaning of that response by Rogers to clarify what was meant by "frequently," that is not the fault of Rogers. A fair reading of Rogers' deposition testimony would be that he did not recall the specific dates of discrimination when asked during his deposition. Rogers did not assert that there were no specific instances of discrimination. If Rogers was subsequently able to refresh his memory and recall when the discrimination happened in an affidavit, that affidavit would not directly contradict his earlier statements. Nor has Ford shown that the Rogers Affidavit is a sham with false information. As pointed out above, Rogers' journal notes indicate specific weeks when the alleged discrimination occurred and Ford had the notes at the time of Rogers' deposition.

Even if Ford could show that the Rogers Affidavit contradicts his deposition testimony, a contradictory affidavit can be introduced if it is "demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Dunn*, 880 F.3d at 910–11 (internal quotations omitted) (quoting *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995)). Such an affidavit can also be introduced to "to clarify ambiguous or confusing deposition testimony." *Id.* (internal quotations omitted) (quoting

11

*Buckner*, 75 F.3d at 292). Rogers has explained in his affidavit that he simply did not recall the specific dates at issue during his deposition and that he needed to consult his notes to refresh his memory. Ford might be correct that in theory Rogers could have consulted the notes when asked about dates at his deposition. It is not clear whether Rogers understood he had that option. The fact that Rogers could not recall dates at his deposition does not mean that Rogers is now lying about the dates that he includes in his declaration and that it is a sham affidavit. Ford possessed Rogers' journal notes at the time of his deposition with the alleged incidents of discrimination. Ford also had the evidence concerning the Opt-on books when Rogers unsuccessfully sought overtime. Ford should not be in any way surprised as to the time periods in question. Thus, Rogers has presented sufficient evidence identifying specific incidents of discrimination.

### 2.  Discrimination Based on Race

Ford also contends that Rogers has failed to point to sufficient evidence that would indicate that any denial of overtime was based on Rogers' race. Ford argues that Rogers' discrimination claim must fail because Rogers declined certain overtime opportunities. Even if Rogers declined certain opportunities for overtime, that would not mean that Ford is excused if it denied Rogers overtime based on his race at the times in question in this case. Ford has offered no evidence to show that Caucasian employees who decline offers of overtime were not again offered overtime opportunities. Ford also argues that Rogers cannot pursue his race discrimination claim because Rogers never filed a union grievance. It is not a requirement for bringing a Title VII claim that a plaintiff must first have filed a union grievance. The record

reflects that Rogers did complain to the union representative, but did not file a formal grievance. The absence of a grievance does not doom Rogers' claim.

Ford also claims that Rogers did not receive requested overtime because his supervisors needed to follow Ford's overtime allocation procedure. According to Rogers, however, Ford failed to consistently follow the overtime allocation procedures. The evidence shows that the overtime procedure was supposed to employ an equalization principle that gave overtime to workers with less accumulated overtime.[2] Rogers contends, however, that such equalization never materialized for him and that Caucasian workers, such as Edward Ernst ("Ernst"), were the recipients of consecutive awards of overtime.[3]

Rogers also contends that Rentschler admitted that he did not follow the overtime allocation procedure. As mentioned above, according to Rogers, in August 2008, he asked Rentschler whether he could get overtime and Rentschler denied the request, stating that he was "not going to pay no one for laying down on the job." (P. Tab 1d at 4). Ford argues that Rentschler's comment was race neutral and does not indicate an animus against African Americans. Ford does not dispute, however, that under the overtime allocation procedure, work performance was not a factor that could be considered when assigning overtime. (R SAF ¶ 4). Yet Rentschler's alleged statement indicates that he was allocating overtime based on work performance, which is inconsistent with the reason provided by Ford. Dunlap also testified at her deposition that Rentschler told her that he could "put whoever he wanted to" on an overtime job. (Dunlap Deposition at 145–46); (SAF ¶ 4). Evidence that an employer acted inconsistent

---

[2] Rogers claims that two supervisors were caught altering overtime equalization sheets. (Statement of Additional Facts ('SAF') Dkt. No. 222-1 ¶ 2. Ford does not admit or deny the facts and instead contends that such facts are immaterial and lack a proper foundation and are therefore inadmissible. (RSAF ¶ 2).
[3] Rogers contends that even if Ernst could be deemed to have seniority over Rogers and entitled to overtime first, the equalization policy would have required that Rogers be offered overtime after Ernst had received overtime.

with a given reason for its actions is circumstantial evidence of pretext. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (stating that "[t]o establish pretext, [the plaintiff] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [defendant's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons"); *Butler-Burns v. Bd. of Trustees of Cmty. Coll. Dist. No. 508, Cty. of Cook, Illinois*, 2018 WL 1468996, at *5 (N.D. Ill. Mar. 26, 2018) (concluding that "the proffered reasons [were] inconsistent and therefore create[d] an inference of pretext for trial"); *Reymore v. Marian Univ.*, 2017 WL 4340352, at *12 (S.D. Ind. Sept. 29, 2017) (indicating that "providing inconsistent reasons for an adverse action may certainly serve as evidence of pretext"). To the extent that Ford seeks to challenge whether Rentschler made the above statement, Rogers' credibility is an assessment to be made by the trier of fact, not at the summary judgment stage. *Khan v. Midwestern Univ.*, 879 F.3d 838, 840 (7th Cir. 2018) (stating that at the summary judgment stage, a court "must resist the trap of assessing the credibility of witnesses, choosing between competing inferences or balancing the relative weight of conflicting evidence"). Evidence showing that supervisors did not follow the overtime allocation procedure is circumstantial evidence that contradicts Ford's given reasons for overtime allocation.[4]

---

[4] The court notes that Rogers has also submitted copy of an Investigation Summary from the City of Chicago Commission on Human Relations. (P. Tab 4: Dkt. No. 221-12). The Commission investigated allegations that Rentschler and Grzych were allocating overtime based on racial preferences and the Commission concluded that there was "substantial evidence of discrimination based on race as to the denial of overtime." (P. Tab 4). Rogers has also submitted a copy of an EEOC Determination report in which the EEOC concluded that "evidence obtained in the investigation establishes reasonable cause to believe that Charging Party and a class of Black employees have been denied overtime opportunities because of their race, Black, in violation of Title VII." (P. Tab 13: Dkt. No. 221-21). Ford argues that the summary and report are inadmissible because they contain hearsay and are not legal adjudications. (Reply at 8).

Ford argues that the fact that one person has more overtime than another person "is not dispositive of whether discrimination has occurred" and that a person may be "treated differently than another for many reasons[] other than race." (Reply at 7). Ford also contends that "[p]ersons may be treated differently for legitimate reasons, or even for unfair or wrong reasons, *absent* discrimination." (Reply at 7) (emphasis in original). While such statements are true, they are points that must be argued before the jury. It is Ford, not Plaintiffs, that is seeking a dispositive ruling as a matter of law in its motion and it is Ford's burden to show that this case should not proceed on to trial. Rogers has pointed to sufficient evidence that would enable a reasonable trier of fact to find discrimination based on race. Therefore, Ford's motion for summary judgment on the race discrimination claim is denied.

B.  Hostile Work Environment Claim

Although Ford appears to move for summary judgment on all remaining claims brought by Rogers, Ford has failed to offer arguments in its memorandum in support of its motion for summary judgment or reply that address Rogers' hostile work environment claim. Ford asserts in its memorandum in support of its motion for summary judgment that Rogers is bringing race discrimination and retaliation claims. (Memorandum In Support of Motion for Summary Judgment "Mem. SJ" Dkt. No. 214 at 3). Yet, it is clear from the amended complaint that Plaintiffs also are bringing hostile work environment claims. In the very caption for Count II, Plaintiffs assert that they are bringing claims "for race discrimination, hostile work environment and retaliation. . . ." (Amended Complaint "A. Compl." Dkt. No. 27 at 6). It is also clear that the hostile work environment allegations are not solely related to the retaliation claims. In Count

II, Plaintiffs specifically assert that they "were subjected to a *racially* harassing work environment. . . ." (A. Compl. at 6) (emphasis added). In addition, Plaintiffs' factual allegations as to harassment, such as being rushed and unnecessarily scrutinized by supervisors indicate that Plaintiffs are pursuing hostile work environment claims. It is not clear whether Ford's failure to address the hostile work environment claim was inadvertent or intentional, but the fact remains that the claim is not addressed by Ford in its filings. Nor was it Rogers' obligation to point out in his opposition brief that Ford had not addressed Rogers' hostile work environment claim.

The analysis for a hostile work environment claim is entirely distinct from an analysis for a race discrimination claim based upon disparate treatment. *See Robinson v. Lake Minnehaha Owner's Ass'n, No. 2:12-CV-108-TLS*, 2012 WL 6197150, at *4 (N.D. Ind. Dec. 12, 2012) (explaining that "[h]ostile work environment claims are different from disparate treatment claims because the issue is not whether particular acts constitute employment discrimination or retaliation, but whether the overall environment in which a plaintiff worked was illegally and racially hostile"); *see also Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 895–96 (7th Cir. 2016) (stating that "[t]o prove a claim for hostile work environment based on race, an employee must show that: '(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability'") (quoting *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 634 (7th Cir. 2009)); *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (explaining analysis for Title VII and Section 1981 hostile work environment claims).

Ford's arguments solely focus on the elements of the *McDonnell Douglas* burden-shifting method of proof used for race discrimination claims and the three element method of proof used

16

for retaliation claims. For example, Ford argues that "staring and increased scrutiny are not adverse employment actions." (Reply at 12). Ford, however, fails to address whether such staring and increased scrutiny could constitute a hostile work environment. Nor does Ford address whether the noose incident was sufficiently severe to create a hostile work environment. The court notes that for a hostile work environment claim, Rogers is not required to show that the harassment was both pervasive and severe. *See Jackson v. Cty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (stating that "[i]t is important to recall that harassing conduct does not need to be both severe and pervasive" and that "[o]ne instance of conduct that is sufficiently severe may be enough"). The trier of fact will need to assess whether the placement of the noose at the workstation of Rogers, an African American, on one occasion is sufficiently severe to create a hostile work environment.[5] *See Cole*, 838 F.3d at 897 (stating that the Court "need not and do[es] not lay down . . . firm rules for when a noose in the workplace is or is not severe enough to be actionable"); *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009)(noting that "the allegations include repeated use of a noose—perhaps the ultimate symbol of racial hatred and hate crimes").

Ford also argues that it is unclear whether it was a noose that was purposefully placed on Rogers' workstation or simply a piece of rope that had inadvertently fallen from some unknown source onto the workstation in a manner that resembled a noose. Ford attempts to downplay the noose incident arguing that it is possible that no noose was placed at Rogers' station and that it was simply his overactive imagination. That may be Ford's view of the evidence, but that is not sufficient to carry the day at the summary judgment stage. Ford repeatedly argues that Rogers'

---

[5] The court notes that because of the connection of a noose to historical racial hatred and because of the timing of the alleged noose placement, the alleged conduct could constitute both racial harassment and retaliation. Plaintiffs in fact allege both stating that they were subjected to a "*racially* harassing environment" and that Ford required them to "work in a hostile work environment "*that included* harassment for taking part in the . . . protected activities." (A. Compl. ¶ 36, 43) (emphasis added).

17

claim based on the noose must fail because "Rogers has no evidence that the alleged item was directed toward him or why the alleged item was placed there in the first place." (Mem. SJ at 10); (Reply at 11). That is precisely the factual issue that the trier of fact must address. Ford is not exonerated from liability simply because Rogers cannot come forward with camera footage or eyewitness testimony to conclusively establish how the noose arrived at Rogers' workstation. It is not surprising that if someone did place the noose at Rogers' workstation, it was done covertly to avoid punishment. Rogers has presented circumstantial evidence supporting his assertion that there was racial discrimination, that his supervisors had a racial animus against African Americans, that he complained about the alleged discrimination, and that the noose appeared at this workstation when he was absent. How and why the rope arrived at Rogers' work station is a question for the trier of fact. *See Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 778 (7th Cir. 2014) (stating that the resolution of certain factual issues were "questions that must be resolved by the trier of fact" and could not "be determined on summary judgment").

Ford also argues that the rope at the workstation did not appear to be a noose. Ford contends that one supervisor did not perceive it as a noose. Rogers, however, believed that it resembled a noose and there is evidence that several other witnesses also perceived it as a noose. There is in fact a picture of the putative noose in the record.[6] Ford argues that "there is conflicting evidence about whether the rope was even in the shape of a noose." (Mem. SJ at 2). Genuinely disputed facts cannot be resolved at the summary judgment stage. Whether or not the rope was hanging from Rogers' workstation in a manner that resembled a noose is a factual determination that is to be made by the trier of fact. *Pittman*, 746 F.3d at 778. Ford has not met

---

[6] Although it is the trier of fact's job to determine whether the rope was arranged as a noose, the photo makes clear that such a perception is not beyond the bounds of reason. (P. Tab 1e: Dkt. No. 221-7).

its burden at the summary judgment stage to show that it is entitled to judgment as a matter of law on the hostile work environment claim. Therefore, to the extent that Ford seeks summary judgment on the hostile work environment claim, the motion is denied.

### C. Retaliation Claims

Ford moves for summary judgment on the retaliation claims. A plaintiff bringing a Title VII or Section 1981 retaliation claim can defeat a defendant's motion for summary judgment by establishing: "'(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.'" *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018)) (quoting *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017)); *Nance v. NBCUniversal Media, LLC*, No. 16-11635, 2018 WL 1762440, at *5 (N.D. Ill. Apr. 12, 2018) (stating that "[t]he Seventh Circuit generally applies the same prima facie requirements to retaliation claims brought under Title VII, Section 1981, and the ADEA").

Ford argues that Rogers has not pointed to any adverse action that could support a retaliation claim. To establish that a plaintiff suffered an adverse action in the retaliation context, the plaintiff must show that the "employer has acted in a way that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Porter v. City of Chicago*, 700 F.3d 944, 956–57 (7th Cir. 2012) (quoting *Thompson v. N. Am. Stainless*, 131 S.Ct. 863, 868 (2011)). Ford argues that Rogers was not the charging party in the EEOC charge and that there is no reason to believe that Rogers' supervisors understood Rogers' connection to the charge. Such an argument is without merit. Dunlap brought the charge on behalf of herself and a class of black employees. Rogers was also listed as a witness in the

19

EEOC files, which Ford would have received. Ford does not dispute that it would have possessed such information.

Ford also cites *Stephens v. Erickson*, 569 F.3d 779 (7th Cir. 2009) for the proposition that Title VII "does not protect an employee from trivial harms, petty slights, nor minor annoyances . . . ." 569 F.3d at 790. Ford fails to explain why it would be a trivial harm and petty slight if an African American employee found a noose hanging from his workstation after complaining about racial discrimination. While Ford argues that there was no noose and speculates that the rope may have accidently fallen onto the work station, such factual determinations are for the trier of fact. The discovery of a noose at a workstation could discourage an employee from pursing any discrimination complaint. Rogers has pointed to sufficient evidence to support his retaliation claims. Therefore, Ford's motion for summary judgment on the retaliation claims is denied.

### III. CONCLUSION

Ford's motion for summary judgment [213] is denied in its entirety.

ENTER:

_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 6, 2018