**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DAVID ROGERS, ET AL.,

      Plaintiffs,

v.

FORD MOTOR COMPANY,

      Defendants.

)
)
)
)
)
)
)
)
)
)

Case No. 2012 CV 07220

Judge Edmond E. Chang

Magistrate Weisman

## DEFENDANT FORD MOTOR COMPANY'S TRIAL BRIEF

Defendant Ford Motor Company submits this trial brief regarding three issues that Ford anticipates may arise during the trial.

*First*, Plaintiff proposes to call as witnesses former plaintiffs in this case to offer "me too" testimony about alleged discriminatory conduct that they, not Plaintiff David Rogers, experienced. Although the Court denied Ford's motion to exclude entirely that form of testimony, the Court in a series of pre-trial orders imposed strict limitations and conditions on any such testimony. This brief sets forth those limitations that the Court imposed.

*Second*, Ford moved to exclude Plaintiff's proposed inflammatory demonstrative of a "noose," given that it bears no resemblance to the object Plaintiff has described and that can be seen in a photograph Plaintiff has offered as evidence. Although the Court did not grant Ford's motion, it ordered that the demonstrative may not be used unless and until Plaintiff establishes that the demonstrative "is substantially similar to the original." R. 313 at 1-2. Plaintiff should not be permitted to use the demonstrative exhibit unless he lays a "*firm* foundation[ ]" for it, which he will be unable to do. *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1231 (7th Cir. 1996) (emphasis added).

*Third*, regardless of how Plaintiff's liability case is presented to the jury, Plaintiff's evidence will be insufficient as a matter of law to justify an award of punitive damages against Ford for a host of reasons. As a result, Plaintiff's punitive damages claim should not be submitted to the jury, and Ford intends to move at the appropriate time under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law. And if punitive damages is submitted to the jury, the Due Process Clause requires that several jury instructions be given in order to avoid the arbitrary deprivation of Ford's property.

## I.    Plaintiff's "Me Too" Witnesses.

The Court previously denied Ford's motion in limine to exclude entirely the testimony of Ford employees Althea Demps, Carline Dunlap, Mark Franklin, and Russell Spalding that they allegedly experienced racial discrimination, hostile work environment, or retaliation against *them*, as opposed to witnessing any such discrimination against Plaintiff.[1] Yet in accepting Plaintiff's proffer in part on those witness' testimony, the Court also imposed limitations and conditions. *See* R. 306 at 1. Ford reiterates its objections to those witness' "me too" testimony, and here sets forth the limitations and conditions imposed on any "me too" testimony offered at trial.

Plaintiff agreed in his proffer that he will *not* elicit testimony from any of the "me too" witnesses about: (1) discipline that they, or any of the other current or former plaintiffs in this lawsuit, experienced;[2] (2) harassment and intimidation from supervisors/management who are not common to Plaintiffs' situation; (3) discrimination, racially hostile work environment, and retaliation outside of the MP&L Department, except to the extent that it involved conduct

---

[1] Plaintiff has since advised that they do not intend to offer the testimony of Franklin or Spalding at trial.

[2] The Court has also ruled that Ford may put on disciplinary evidence concerning these individuals if they open the door through their testimony. *See, e.g.*, Pretrial Conference Transcript, Vol. 2, Dec. 16, 2019, at 189:9-11, 190:25–191:23.

pertaining to Bill Rentschler, Dana Joyce, John Grzych, Jeff Brooks, or Al Ourednik, or that came up during the course of any of Ford's investigations into any of Plaintiff's complaints; (4) their health issues; (5) any monetary damages other than income lost in connection with being deprived of overtime and overtime opportunities; and (6) with respect to Ms. Dunlap, her allegations that Ford violated its settlement agreements with her.  *See generally* R. 295

At the pretrial conference, Plaintiff further clarified the limitations on the testimony that he might elicit from the "me too" witnesses.

*First*, with respect to those witnesses' "participat[ion] in Ford's investigations into any complaints of race discrimination and/or retaliation" (R. 295, at 2, 4, 6, 8), Plaintiff confirmed that he was referring only to:  (1) an alleged August 13, 2008 internal complaint letter; (2) the August 2008 EEOC charge against Ford filed by Ms. Dunlap (and, with respect to Ms. Demps, the October 2008 charge with the Chicago Commission on Human Relations); and (3) "the investigation into the noose," *see* Pretrial Conference Transcript, Vol. 2, Dec. 16, 2019, at 127:14–128:10 (confirming "that's the waterfront" with respect to Ford's investigations); *id.* at 131:14-19 (agreeing that "participating in Ford's investigations into any complaints of race discrimination" refers only to "the August 2008 internal complaint, the Chicago Commission and EEOC charges, and the noose").

*Second*, with respect to testimony about "incidents of being stalked, overly scrutinized, given increased workloads, being rushed, made to work outside of job assignments,[3] and otherwise intimidated by management for complaining of race discrimination" (R. 295, at 2, 4-5, 7, 9), Plaintiff clarified that he would not elicit "any testimony" relating those acts "from managers or

---

[3]  Plaintiff himself testified that he had no issues with job placement, so this testimony would be particularly irrelevant and prejudicial.  Pl. Depo., D. Trial Ex. 331 at 85  ("I didn't have a problem getting any job placements with MP&L.").

supervisors that were not over the Plaintiff" (Pretrial Conference Transcript, Vol. 2, Dec. 16, 2019, at 130:21-24). "In other words," Plaintiff agreed that he would not "bring[ ] up supervisors that don't have anything to do with Mr. Rogers' claim as performing . . . this bad conduct." *Id.* at 130:24–131:2.

*Third*, Plaintiff confirmed that the same limitation applied with respect to testimony about "race discrimination and hostile work environment," agreeing that he would seek testimony about those topics from "me too" witnesses only insofar as they were "perpetrated by the supervisors in common with Mr. Rogers." Pretrial Conference Transcript, Vol. 2, Dec. 16, 2019, at 131:25–132:5.

*Fourth*, Plaintiff "represented that he will only elicit testimony from former plaintiffs that they sought overtime and that they did not receive it (but should have)—but will not attempt to quantify the specific amount of lost overtime." R. 306 at 1.

*Fifth*, as discussed during the pretrial conference and confirmed in the Court's subsequent order (R. 306 at 1), Plaintiff "must limit the former plaintiffs' testimony on alleged discrimination and retaliation to the 2008-2010 time period (that is, the time period that Rogers himself alleges that he experienced discrimination and retaliation)."

While preserving its objections to "me too" testimony of any kind, Ford respectfully submits that these limitations—at a minimum—must be strictly enforced during the trial, and Ford will object and seek all available relief if the witnesses testify beyond these limitations. In addition, the witnesses should be instructed about these limits outside the presence of the jury immediately before they begin testifying.

## II. Proposed Demonstrative Exhibit.

The Court should not allow Plaintiff to use the proposed highly inflammatory demonstrative exhibit of a noose. There is a photograph of the supposed "noose," and if Plaintiff

wishes to use a demonstrative, he should use the photograph, assuming proper foundation and other evidentiary requirements are satisfied. Instead, recognizing that no jury would find that the object in the photograph is a noose, Plaintiff's counsel's husband created a prototype that is substantially different in significant and critical ways from the object seen in the photograph. Plaintiff's strategy is clearly to distract—to focus the jury on the demonstrative (created by an attorney 12 years after the fact), rather than the evidence. The prejudice to Ford if the noose demonstrative is paraded before the jury is incalculable and incurable. This symbol is so inflammatory that once introduced, no instruction will be able to avoid inflaming the passion of the jury.

Ford recognizes that the Court denied Ford's motion in limine. But the Court also ruled that Plaintiff may only use the demonstrative if "one of the witnesses can testify that it is substantially similar to the original." R. 313 at 1-2. Ford submits that Plaintiff will be unable to meet even this standard and certainly cannot establish the "*firm* foundation[ ]" required for such an inflammatory demonstrative exhibit. *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1231 (7th Cir. 1996) (emphasis added).

## A. The Court Should Not Allow Plaintiff to Use the Proposed Demonstrative Exhibit.

Trial courts "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . make those procedures effective for determining the truth." Fed. R. Evid. 611(a). Demonstrative exhibits have only a secondary or derivative function: they explain or clarify already admitted evidence. *Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 707 (7th Cir. 2013). Thus, a demonstrative exhibit must be accurate and reliable and must assist the factfinder in understanding the evidence. *See Verizon Directories Corp. v. Yellow Book USA, Inc.*, 331 F. Supp. 2d 136, 139-44 (E.D.N.Y. 2004).

5

Plaintiff's proposed demonstrative does not assist the factfinder in understanding the evidence—it distracts the factfinder from the evidence. There is a photograph of the object in question, and Plaintiff should be limited to that photograph as the demonstrative.

The photograph, which (presumably) will be entered into evidence shows the following object:



That object is not in the shape of a noose, does not contain the "hangman's knot that defines a noose, is made up of multiple different kinds of materials, and has a mysterious looking tag on it. It looks nothing like a noose.

A noose has certain defining characteristics. *See* Tyiarah Adewakun, *Hanging on to Justice: Why the Display of a Hangman's Noose in the Workplace Gives Rise to a Racially Hostile Work Environment*, 20 Rutgers Race & L. Rev. 13, 13 ("A noose can be described as a loop formed

in rope, cord, etc. by means of a slipknot so that the loop tightens as the rope is pulled.") (internal quotation marks omitted); La. Rev. Stat. § 14.40.5 (defining "noose" as "a rope tied in a slip knot, which binds closer the more it is drawn, which historically has been used in execution by hanging, and which symbolizes racism and intimidation"). A simple Google images search shows the shape and knot that characterize a noose:



Obviously aware that the photograph of the object refutes Plaintiff's claim that the object was a noose, and desperate to deliver an image of an actual noose that does not appear in the photograph, Plaintiff's counsel had her husband create this demonstrative:



The demonstrative alters the shape of the object in the photograph to make it look more like an actual noose than the object in the photograph. It introduces the hangman's knot, which is not visible in the photograph. And it omits the tag present in the photograph.

The proposed demonstrative was not created by Plaintiff (or any other witness). Nor was it authenticated by Plaintiff (or any other witness). And there is no evidence that the proposed

demonstrative is an accurate reflection of the original object—indeed the photograph refutes any such suggestion. As a result, the Court should not allow Plaintiff to use it. *See Wilbon v. Plovanich*, No. 12 C 1132, 2016 WL 3922906, at *3 (N.D. Ill. July 21, 2016) (concluding that a hand-drawn "map" created by an investigator that the witness did not "sign off . . . as a correct and accurate representation" was properly excluded); *Lekkas v. Mitsubishi Motors Corporation*, 2005 WL 2989899, at *5 (N.D. Ill. Nov. 3, 2005) ("without a showing of similarity," the videos were "just similar enough to the events at issue to confuse the jury and leave the jurors with the prejudicial impression of a recreation of the actual occurrence according to Defendants' theory of causation"); *Fusco v. General Motors Corp.*, 11 F.3d 259, 264 (1st Cir. 1993) (reasoning that exclusion of a demonstrative exhibit was proper when that exhibit was "rife with the risk of misunderstanding"). If shown to the jury, the demonstrative will "leave the jurors with the prejudicial impression" that the proposed demonstrative exhibit is the actual item at issue. *See Lekkas*, 2005 WL 2989899, at *5.

The Seventh Circuit has stressed that trial courts must be careful about the use of demonstrative exhibits. *Finley*, 75 F.3d at 1231 (affirming district court's exclusion of demonstrative evidence). Visuals are powerful, and "in some cases too powerful, as we learn in *Julius Caesar* from Antony's masterful demagogic use of Caesar's blood-stained toga and slashed body to arouse the Roman mob." *Id.* For that reason, "the trial judge must make sure that the jury is not misled concerning the actual meaning of the object in the context of the litigation." *Id.*

Given that there is an actual photograph of the object in question, the additional probative value of a manufactured noose is miniscule. And the danger of unfair prejudice or misleading the jury is enormous. *See Wilbon*, 2016 WL 3922906, at *3 (citing Fed. R. Evid. 403). This is precisely why the balancing test in Rule 403 was created. *See Old Chief v. United States*, 519 U.S.

9

172, 184-85 (1997) ("[W]hen Rule 403 confers discretion by providing that evidence 'may' be excluded, the discretionary judgment may be informed not only by assessing an evidentiary item's twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives.").

It is clear, given the fact that there is a photograph, the differences between the demonstrative and the photograph, and the nature of the object itself that "the only conceivable reason" for using the demonstrative is "to inflame the jury." *Ferrier v. Duckworth*, 902 F.2d 545, 548 (7th Cir. 1990). "Because the noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence, there exists a real and substantial danger that the noose evidence could lead the jury to decide the case on an improper emotional basis." *E.E.O.C. v. Caterpillar, Inc.*, No. 03 C 5637, 2004 WL 2092003, at *1 (N.D. Ill. Sept. 14, 2004) (internal quotations and citation omitted) (excluding evidence of a noose found at plaintiff's home). As the Seventh Circuit has explained, "the noose is a visceral symbol of the deaths of thousands of African-Americans at the hand of lynch mobs." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009). Thus, even if "the jury will know that the demonstrative is not the actual alleged noose that was found" (R. 313), permitting Plaintiff to use a tangible, visual item that it not what Plaintiff actually saw will be prejudicial and inflammatory. And that unfair prejudice is entirely unnecessary given the testimony and photographic evidence that will be presented to the jury.

Plaintiff suggests that the proposed demonstrative exhibit will assist him in describing what the actual item looked like—particularly in the face of cross-examination. *See* Pl.'s Resp. to Def. Ford's Mot. in Limine at 3, R. 303. But this is presumably why he had his friend take the photograph of the noose. What Plaintiff is saying is that the photograph itself will not allow him to effectively and persuasively convey to the jury that the object is a noose. This is tantamount to

an admission that the object is not a noose and that no one looking at the photograph would believe otherwise. It is simply improper for Plaintiff to be allowed to materially alter what he actually saw in the photograph in order to fit the story he wants to tell the jury. That is textbook manufactured evidence only here it is a manufactured demonstrative. Plaintiff may not simply describe the proposed demonstrative exhibit to the jury because it is not the actual item. It is not even evidence. *See Baugh ex rel. Baugh*, 730 F.3d at 707 (explaining that demonstratives "are used to aid the jury in its understanding of the evidence that *has already been admitted*") (emphasis added). And there *is* evidence—the digital photograph.

### B. If the Proposed Demonstrative is Not Excluded, Plaintiff Must Lay a Firm Foundation Before He Uses It.

In all events, the demonstrative may not be used until there is evidence in the record that could support it, and upon a finding by the Court that the demonstrative is substantially similar to that evidence. *See Baugh ex rel. Baugh*, 730 F.3d at 707; *Estate of Carey by Carey v. Hy-Temp Mfg., Inc.*, 929 F.2d 1229, 1235 (7th Cir. 1991). Indeed, the Court ordered expressly that the proposed demonstrative may be used only if "one of the witnesses can testify that it is substantially similar to the original." R. 313 at 2.

The Seventh Circuit has advised that "judges should be cautious in allowing the introduction of physical exhibits . . . without *firm* foundations." *Finley*, 75 F.3d at 1231 (emphasis added). That is because "[a]fter hearing a welter of confusing and contradictory testimony," the jury will be tempted "to resolves its doubts on the basis of a simple, tangible, visible . . . object." *Id.* That risk is especially acute here because the object is not admissible evidence, but merely a demonstrative exhibit.

The burden of foundation here should be a significant one. As the Seventh Circuit has explained, "[a]n important body of psychological research undermines the lay intuition that

11

confident memories of salient experiences . . . are accurate and do not fade with time." *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009) (quoting *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 296-97 (7th Cir. 1990)). In other words, as time passes, there is a heightened risk that memories will fade. *See Bartlett*, 567 F.3d at 906.

There is no question that Plaintiff's memory of the actual item—from 12 years ago—has faded. Indeed, Plaintiff did not create the proposed demonstrative exhibit from his memory. It is unlikely that Plaintiff will now be able to testify in a reliable way to the features of the object he saw 12 years ago, as he must to lay the necessary foundation. *See* Fed. R. Evid. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . make those procedures effective for determining the truth.").

## III. Punitive Damages.

"[P]unitive damages pose an acute danger of arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). They are "quasi-criminal" in nature and "concerns of reasonableness and adequate guidance from the court . . . enter into the constitutional calculus" "when the case is tried to a jury." *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 19 (1991). No matter how Plaintiff's liability case is presented to the jury, Plaintiff's case for punitive damages is manifestly insufficient as a matter of law to justify an award of punitive damages against Ford. Plaintiff's punitive damages claim should not be submitted to the jury, and Ford intends to move at the appropriate time under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law. And if punitive damages is submitted to the jury, the jury must be properly instructed to avoid the significant risk that the jury would impose punitive damages improperly. *See Philip Morris USA v. Williams*, 549 U.S. 346, 357 (2007) ("where the risk" of the jury imposing punitive damages improperly "is a significant one . . . a court, upon request, *must protect against that risk*") (emphasis added).

## A.    Punitive Damages Should Not Be Submitted to the Jury.

As an initial matter, the evidence at trial will be insufficient to send Plaintiff's punitive damages claim to the jury, for several reasons.

*First*, an employer cannot be held liable for punitive damages unless the plaintiff proves that "the employee who discriminated against him was a manager, acting within the scope of his employment." *Cooke v. Stefani Mgmt. Servs., Inc.*, 250 F.3d 564, 568 (7th Cir. 2001).  Plaintiff's punitive damages claim will likely hinge on that allegation that a "noose" was left in his work area. He does not purport to know who left the supposed "noose" near his workplace, and there is not a hint of a suggestion that it was left by any managerial employee at Ford.  Further, at this juncture where discovery has closed, there is *no evidence*, allegation, or suggestion that this item was left by a managerial employee at Ford, let alone one acting within the scope of his employment.

To the contrary, Ford took his complaints seriously, affirmatively investigated his allegations, and concluded in good faith that his complaints were unfounded.  Those "good faith efforts," which will be proven at trial, demonstrate that Ford "itself did not act in reckless disregard of federally protected rights, thus making it inappropriate to punish the employer for its [manager's] contravention of its established policies." *Cooke*, 250 F.3d at 568 (quotation marks omitted; alteration in original)

*Second*, to the extent Plaintiff argues at trial that Ford was somehow deficient in responding to complaints or investigating Plaintiff's allegations, that would not support a punitive damages award as a matter of law.  Punitive damages may be awarded only if a defendant acts intentionally or with reckless disregard of a plaintiff's federally protected rights—failing to act or mere "negligence" is not enough. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 376 (7th Cir. 2000); *see also May v. Chrysler Grp., LLC*, 716 F.3d 963, 974 (7th Cir. 2013) (holding that evidence was

insufficient to show "reckless disregard" even though employer "could have done more and undertaken different measures").

*Third*, where there is a reasonable disagreement on whether a party acted properly, that is not a basis for a punitive damages award. If a defendant acted in good faith, even if its actions were ultimately wrongful, the defendant cannot have acted with malice or reckless disregard. *See Gile*, 213 F.3d at 376 ("Although [defendant] wrongly believed that [plaintiff] was not disabled under the ADA and did not adequately address her accommodation request, [defendant] did not exhibit the requisite reckless state of mind" for punitive damages). Indeed, to *punish* a defendant with a punitive damages award based on conduct that was not clearly unlawful would be unconstitutional. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.").

There are certainly other grounds that Ford will press in its Rule 50 motion, depending on the evidence that is admitted at trial. There is no evidence or allegation in the case that could support a punitive damages award as a matter of law, and therefore the Court should not submit punitive damages to the jury. That is especially true, given that Plaintiff must prove the elements of punitive damages by clear and convincing evidence. *Cf. Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 433 (1994) ("[T]he clear and convincing standard of proof[] is an important check against unwarranted imposition of punitive damages.").

### B. If Submitted to the Jury, Numerous Instructions on Punitive Damages Would Need to Be Given.

If the Court decides to submit Plaintiff's punitive damages claim to the jury, several jury instructions will be necessary in order to minimize the risk of an improper punitive damages award.

14

*See Williams*, 549 U.S. at 357. Importantly, these instructions are not discretionary; they are premised on Ford's constitutional due process rights, and therefore *must* be given. *See id.* at 353 ("Given the risks of unfairness [in a punitive damages award] . . . , it is constitutionally important for a court to provide assurance that the jury will ask the right question, not the wrong one"). Ford will submit these instructions in connection with the Court's procedures; below is just a summary of the instructions that will be necessary, which Ford will supplement depending on the evidence admitted at trial.

*First*, the Court should adopt Ford's proposed instruction that "[i]n determining the proper amount of punitive damages, if any, you may not consider Defendant's size, wealth, or overall profits and revenues." *See Gore*, 517 U.S. at 574-85; *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 508-09 (7th Cir. 1992); *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 932 F. Supp. 200, 223 (N.D. Ill. 1996) (Easterbrook, J.). Plaintiff's only objection to this instruction—that this instruction should not be given if there has been no evidence in the trial of Ford's financial condition—is not well-founded. Ford is a well-known corporation and its size and perceived wealth are widely recognized regardless of what evidence is presented at trial.

*Second*, the jury must be instructed that any punitive damages that are awarded must be limited to the specific harm to Plaintiff and cannot be based on harm to third parties. *See Williams*, 549 U.S. at 353 ("the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation"); *State Farm*, 538 U.S. at 422 (to warrant punitive damages "conduct must have a nexus to the specific harm suffered by the plaintiff"). To avoid the risk of an improper punitive damages award,

the jury should be specifically instructed that any harm to Plaintiff's "me too" witnesses is irrelevant to and cannot be a basis for punitive damages.

*Third*, the jury should be specifically instructed that where reasonable minds can disagree on whether a particular course of action was proper, that cannot form a basis for the award of punitive damages. If a defendant's course of conduct was objectively reasonable—even if ultimately unlawful—the defendant cannot have acted with malice of in reckless disregard of the plaintiff's rights under federal law. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 (2007) ("disagree[ing]" with defendant's analysis of its legal obligations, but holding that because defendant's interpretation, "albeit erroneous, was not objectively unreasonable," defendant could not be said to have acted "willfully" or with "reckless disregard").

*Fourth*, the jury should be instructed that a mere failure to investigate is not a proper basis for punitive damages. That may qualify as *negligence*, but a mere failure to act does not meet the "malice" or "reckless disregard" standard required for punitive damages. *See May*, 716 F.3d at 975 (evidence insufficient to prove malice or reckless indifference even though employer "could have done more to stop the harassment").

*Fifth*, the jury should be instructed that the size of any punitive damages award must bear a reasonable relationship to the amount of harm caused to Plaintiff by Ford punishable misconduct. *See State Farm*, 538 U.S. at 427 ("courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered"). If the compensatory damages awarded are substantial, then a punitive damage award equal to the compensatory award can reach the outermost limit permitted by law, although a lesser amount may be appropriate. *See id.* at 425 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due

process guarantee."). And in any event, the ratio of punitive damages to compensatory damages should not exceed 4 to 1. *See id.* ("In *Haslip*, in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. We cited that 4–to–1 ratio again in *Gore*.") (citations omitted).

*Sixth*, the jury should be instructed that punitive damages cannot be awarded against Ford unless the Ford employees who discriminated or retaliated against Plaintiff were managerial employees acting within the scope of their employment. *See* Federal Civil Jury Instructions of the Seventh Circuit 3.13; *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir. 2001) ("The plaintiff must demonstrate that the employees who discriminated against him are managerial agents acting within the scope of their employment."). For that reason, the jury should be specifically instructed that the object Plaintiff asserts was a "noose" cannot be a basis for awarding punitive damages, given that he has no evidence that any managerial employee left the object near his workstation.

*Seventh*, the jury should be instructed that it may award punitive damages only if Plaintiff proves each of the elements of punitive damages by clear and convincing evidence. *See* Federal Civil Jury Instructions of the Seventh Circuit 7.28 Committee Comment (b) (noting the unsettled state of law in the Seventh Circuit on the burden of proof for punitive damages); *see White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 821 (6th Cir. 2004) (Sutton, J., dissenting in part) ("Supreme Court precedents concerning punitive damages and comparable forms of relief, as well as relevant state-law practices, suggest that a clear and convincing standard of proof ought to govern these claims"); *cf. Honda Motor Co.*, 512 U.S. at 433 ("[T]he clear and convincing standard of proof[ ] is an important check against unwarranted imposition of punitive damages."). The jury

17

should also be instructed that clear and convincing evidence means that when they have considered all of the evidence, they must be convinced that it is highly probable that it is true, a higher burden of proof than "more probably than not true." Federal Civil Jury Instructions of the Seventh Circuit 1.28.

Dated:  January 12, 2020

Respectfully submitted,

**BERKOWITZ OLIVER LLP**

By: /s/ Kathleen M. Nemecheck
      Kathleen M. Nemecheck      ARDC #50139
      Jocelyn A. Villaneuva    *Admitted Pro Hac Vice*
      2600 Grand Boulevard, Suite 1200
      Kansas City, Missouri 64108
      Telephone:  (816) 561-7007
      Facsimile:  (816) 561-1888
      E-Mail:      knemecheck@berkowitzoliver.com
                 jvillanueva@berkowitzoliver.com

      Mark H. Boyle      ARDC #6200934
      Karen Kies DeGrand      ARDC #6191140
      Curtiss Schreiber
      Donohue Brown Mathewson & Smyth LLC
      140 South Dearborn Street, Suite 800
      Chicago, Illinois 60603
      Telephone:  (312) 422-0900
      Facsimile:  (312) 422-0909
      E-Mail:      mark.boyle@dbmslaw.com
                 karen.degrand@dbmslaw.com

      Blaine H. Evanson      *Admitted Pro Hac Vice*
      Gibson, Dunn & Crutcher LLP
      3161 Michelson Drive
      Irvine, California 92612
      Telephone:  (949) 451-3805
      Facsimile:  (949) 475-4768
      E-Mail:      bevanson@gibsondunn.com

      ***Attorneys for Defendant Ford Motor Company***