**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAVID ROGERS, ET AL., | ) |
| Plaintiffs, | ) ) Case No. 2012 CV 07220 |
| v. | ) ) Judge Edmond E. Chang |
| FORD MOTOR COMPANY, | ) ) Magistrate Weisman |
| Defendant. | ) ) |

**DEFENDANT FORD MOTOR COMPANY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW**

None of Plaintiff David Rogers' claims against Ford should be submitted to the jury, because he has failed to offer sufficient evidence to support one or more necessary elements for each claim. Plaintiff's race discrimination claim based on denial of overtime fails because he cannot identify a single instance when Ford denied him overtime because of his race. His remaining liability claims depend on the incident where he allegedly found a noose near his workstation. But he admitted that he has no idea who put the supposed noose there, and he has no evidence of why someone might have done so. And his remaining allegations—that his supervisor, Bill Rentschler made one non-racially tinged comment, that Rentschler and other supervisors made him uncomfortable by staring at him, and that one co-worker stopped talking to him—are not remotely sufficient to establish liability on any theory of discrimination or retaliation, much less to justify punitive damages. For these and other reasons, the Court should grant judgment as a matter of law to Ford.

**STANDARD OF REVIEW**

Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient

evidentiary basis for find for the party on that issue." Fed. R. Civ. P. 50(a). "[A] verdict supported by no evidence or a mere scintilla of evidence will not stand." *Martin v. Milwaukee Cty.*, 904 F.3d 544, 550 (7th Cir. 2018).

## ARGUMENT

### I. PLAINTIFF'S RACE DISCRIMINATION CLAIM BASED ON DENIED OVERTIME FAILS.

Plaintiff failed to offer sufficient evidence for a reasonable jury to conclude that he was ever denied overtime (or was not offered an opportunity for overtime) because of his race. Plaintiff acknowledged that he was "asked by a supervisor or manager to work some overtime through [his] breaks when [he was] an ILTO." 1/15 AM Tr., at 31. He conceded that Rentschler offered him the opportunity for weekday overtime on multiple occasions in August 2008. 1/15 AM Tr., at 39, 40, 42, 43. He admitted that he worked 146 hours of overtime in 2009 and more than 200 hours of overtime in 2010. 1/15 PM 2 Tr., at 44-45; DX 342. And Plaintiff's own chart purporting to summarize overtime hours for ILTOs shows that he worked the same overtime as—or more overtime than—many white ILTOs throughout 2008-2010. *See* PX 262, 264; *cf.* PX 252, 254. Indeed, Plaintiff identified just one specific instance where Rentschler denied his request to work overtime and provided no evidence to suggest that denial was based on his race. 1/15 AM Tr., at 42. Plaintiff admits that he turned down overtime the next time Rentschler offered (*id.* at 43-44), and the record reflects multiple other instances in which Plaintiff turned down overtime (1/16 PM 1 Tr., at 86).

On this record, no reasonable jury could conclude that Ford denied Plaintiff overtime because of his race. *See Conley v. Village of Bedford Park,* 215 F.3d 703, 711-12 (7th Cir. 2000) (unsupported allegations that do not set forth "any specific times" when overtime was denied are "wholly inadequate to make out a prima facie case of discrimination"); *see also Bennett v Potter*, 2011 WL 1231166, at *7 (N.D. Ill., March 30, 2011) (granting summary judgment because

2

allegations of being denied overtime "four or five" times without providing specific dates are insufficient). Without identifying specific times when he was allegedly denied overtime, Plaintiff cannot show that he was denied overtime based on race, as opposed to not being offered the opportunity for overtime because of seniority, unavailability, or the general, race-neutral rules by which Ford allocated weekday and weekend overtime opportunities. *See* 1/17 AM Tr., at 19 (weekday overtime opportunities offered to the primary operator, then to the team leader and/or general utility, and then to another ILTO); 1/15 PM 2 Tr., at 7 (Plaintiff agreeing that weekday overtime opportunities were offered first to the primary operator); 1/17 AM Tr., at 25-31 (weekend opportunities offered based on specific need, equalization reports, consultation with union, and other factors). In fact, Plaintiff contends (without evidentiary support) that he was denied by Rentschler because Rentschler preferred to give overtime opportunities to white employees. *See* 1/15 AM Tr., at 37. But the undisputed evidence—offered by Plaintiff's own witnesses—was that Rentschler was not in charge of allocating weekend overtime, the bulk of overtime hours. *See* 1/16 AM Tr., at 34 ("When it came to overtime on the weekends, it actually had to go through Ourednik, Al Ourednik."); 1/15 AM Tr., at 32 (Plaintiff testifying that weekend overtime was more lucrative because it required more hours than weekday overtime).

To fill in these evidentiary gaps, Plaintiff offered summaries purporting to compare average overtime of black ILTOs against average overtime of white ILTOs. *See* PX 252, 254, 262, 264. But the difference in averages, according to the PAR records as reflected in Plaintiff's own summaries, was per period a mere 6 hours in 2008, 5 hours in 2009, and 4 hours in 2010—a difference that is entirely attributable to a few outliers. *See* 1/17 PM Tr., at 39-40; PX 262, 264. And those records did not account for the employees' varying seniority, shift or dock assignment, classification changes, supplemental classification, being out on extended leave, or

3

even whether the employees signed up for overtime on the opt out logs—all of which were undisputed factors for who received overtime and when. *See* 1/17 PM Tr., at 23-24.

In sum, Plaintiff's evidence of race discrimination based on denial of overtime is that white ILTOs, on average, received a few more hours of overtime per period than black ILTOs, on average; that some white ILTOs worked more overtime than he did (although he worked more overtime than other white ILTOs); that Plaintiff's impression was that Rentschler generally gave more opportunities to white employees than to black employees (although Plaintiff was only able to identify Ed Ernst as a similarly situated white ILTO who received an opportunity that Plaintiff should have received); and that on one occasion, Rentschler refused a request for overtime (while Plaintiff declined the next opportunity). No reasonable jury could find race discrimination on these facts.

## II. PLAINTIFF'S RACE-BASED HOSTILE WORK ENVIRONMENT BY SUPERVISORS CLAIM FAILS.

**A.** Plaintiff presented insufficient evidence for a reasonable jury to conclude that his supervisors subjected him to harassment based on his race, much less that any harassment was "severe or pervasive." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). The sum total of Plaintiff's evidence that is conceivably relevant to this claim was that: (1) Rentschler said he would not pay anyone to lay down on the job (1/15 AM Tr., at 42-43); (2) someone placed an alleged noose near his workstation (1/15 PM 1 Tr., at 14-15) and (3) some of his supervisors watched him in what he describes as an intimidating manner (*id.* at 6-7). This alleged conduct is insufficient as a matter of law.

*First*, Plaintiff offered no evidence to suggest that any conduct attributable to his supervisors was based on his race. He interpreted Rentschler's comment as accusing him of laziness, but conceded that neither Rentschler nor any of his other supervisors *ever* made any

4

racial comments. 1/15 PM 2 Tr., at 28-29. He claims that his supervisors stared at him because he filed complaints, not because of his race. *See Villarruel v. Mukasey*, 266 F. App'x 473, 475 (7th Cir. 2008) ("The other events of which [plaintiff] complains, such as requests that she work faster and reduce her socializing on the job, are unrelated to race or national origin."). And he has no evidence whatsoever that any of his supervisors was responsible for placing the alleged noose near his workstation—indeed, he "just do[esn't] know who put it there." 1/15 PM 2 Tr., at 37. It may have been Plaintiff's "opinion that John Grzych and Bill Rentschler knew somebody had put that noose on my job." 1/15 PM 1 Tr., at 23. But there is no evidence from which a reasonable jury could conclude that Plaintiff's supervisors even knew someone had placed the supposed noose near Plaintiff's workstation, much less that they had done so (or directed someone else to do so).

*Second*, one non-racial statement and excessive staring—even in a supposedly intimidating manner—are not remotely severe or pervasive as the law requires. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) ("To support his claim, [plaintiff] contends his supervisors were 'short tempered,' 'hostile,' unfairly critical, and disrespectful. He also says he was 'subjected to excessive monitoring.' Such conditions are not objectively offensive, severe, or pervasive."); *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) ("one utterance of the n-word has not generally been held to be severe enough to rise to the level of establishing liability"). Indeed, Plaintiff did not even believe that his supervisors' staring made his work environment hostile or abusive; rather, he admitted, when asked by his counsel, that he was still able to do his job. 1/15 AM Tr., at 65 ("I mean, you still had to do your job.").

**B.** Even if the statement and conduct of Plaintiff's supervisors were sufficient, Ford exercised reasonable care to prevent and correct harassing conduct in the workplace. There is no

5

dispute that Ford promulgated and implemented robust anti-harassment policies. *See*, *e.g.*, 1/15 PM 1 Tr., at 58 (Plaintiff signed anti-harassment policy to acknowledge receipt). And although Ford offered Plaintiff numerous ways to report harassment (*see*, *e.g.*, 1/15 PM 1 Tr., at 57 (Plaintiff knew he could report problems to Labor Relations office)), Plaintiff never asserted a complaint to HR or Labor Relations referring to the supposed noose or *any* conduct other than the alleged denial of overtime (*see* 1/15 PM 2 Tr., at 42). Thus, at a minimum, Ford is entitled to judgment as a matter of law on its affirmative defense.

### III. PLAINTIFF'S RETALIATORY HOSTILE WORK ENVIRONMENT BY CO-WORKERS CLAIM FAILS.

To succeed on his claim that his co-workers subjected him to a hostile work environment in retaliation for his race-discrimination complaints, Plaintiff must prove that (1) his work environment was "objectively and subjectively offensive"; (2) "the harassment was … in retaliation for protected behavior"; (3) "the conduct was severe or pervasive"; and (4) "there is a basis for employer liability." *Boss*, 816 F.3d at 920. Plaintiff failed to provide sufficient evidence to satisfy any of these elements.

**A.** Plaintiff offered no evidence of any offensive conduct by his co-workers. Indeed, the only conduct that he linked to any co-worker was that his relationship with one co-worker "diminished," when the co-worker "stopped talking" to him. 1/15 AM Tr., at 61. But Plaintiff did not testify that he was offended by that change in their relationship, nor is it objectively offensive for one co-worker to stop talking to another. *See Villarruel*, 266 F. App'x at 476 ("Title VII is not a code of office civility."). Plaintiff offered no testimony connecting the supposed noose to a co-worker; rather, he testified that he had no idea who placed it there. 1/15 PM 2 Tr., at 36-37.

6

**B.** Even if Plaintiff had offered sufficient evidence of offensive conduct by his co-workers, it would not have qualified as severe or pervasive conduct. Placing a noose anywhere in a workplace is offensive and unacceptable conduct. But courts have held that isolated and temporary incidents like the one Plaintiff alleges, where there is no evidence the object was directed at the Plaintiff and no evidence of who placed the object or why, are not sufficiently "severe or pervasive" to give rise to a hostile work environment claim. *See Tolliver v. YRC, Inc.*, 729 F. App'x 332, 333 (5th Cir. 2018) ("two incidents where unknown persons left a noose in [defendant] YRC facilities, and one incident where someone wrote racist graffiti on a YRC truck" were not severe or pervasive); *Mays v. Town of Hempstead*, No. 10-CV-3998, 2012 WL 5866230, at *6-7 (E.D.N.Y. Nov. 16, 2012) (granting summary judgment on hostile work environment claim based on "the singular hanging of the noose and black-faced doll"); *Woods v. Austal, U.S.A., LLC*, No. 09-669, 2011 WL 1380054, at *20 (S.D. Ala. Apr. 11, 2011) (granting summary judgment where plaintiff saw rope that "he perceived to be a noose, as well as the two nooses about which he heard," and explaining that "the Eleventh Circuit has never held that the temporary display of a noose by a rogue employee creates a *per se* hostile work environment").

**C.** Moreover, Plaintiff failed to show that any of this conduct was because of his discrimination complaints. "A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity." *Boss*, 816 F.3d at 918. Here, Plaintiff has nothing more. He offered no evidence or testimony to show that any of his co-workers even *knew* about his discrimination complaints. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("It is not sufficient that [plaintiff's supervisor] *could* or even *should* have known about [plaintiff's] complaints; she must have had actual knowledge of the complaints for her decisions to be retaliatory."). Plaintiff testified that he never told anyone in his department that

he had filed a CCHR charge. 1/15 PM 2 Tr., at 38. And Chris Peace and Natalie Dahringer offered unrebutted and unimpeached testimony that they did not tell anyone in the MP&L department about Plaintiff's discrimination complaints until long after September 5, 2008, the date Plaintiff allegedly found the noose. 1/14 AM Tr., at 52-54; 1/15 AM Tr., at 73.

  **D.** In any event, Plaintiff offered insufficient evidence to hold *Ford* liable on this claim, because he cannot show that Ford knew or should have known that a co-worker would commit retaliatory harassment before the harassment occurred. *See Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 811 (7th Cir. 2000) ("[I]n the usual case of coworker harassment, the employer becomes liable to the employee only when it knows or should know that wrongdoing is afoot and yet fails to take steps reasonably designed to stop it."). Plaintiff offered no evidence or testimony that Ford hand *any* notice that there was any potential for harassment by his co-workers, much less that Ford had "enough information to make a reasonable employer think that there was some probability that" he was being harassed. *Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 606 (7th Cir. 2006). To the contrary, he testified that someone hung the supposed noose within a two minute window. 1/15 PM 1 Tr., at 13-14. And he never told anyone in his department that he had filed a CCHR charge (1/15 PM 2 Tr., at 38), so there is no basis for supposing that Ford could have known about the potential for retaliatory harassment.

  **E.** Finally, Plaintiff offered insufficient evidence to show that Ford failed to take reasonable steps to correct the situation. *See Cole v. Bd. of Trustees of N. Ill. Univ.*, 838 F.3d 888, 898 (7th Cir. 2016).("There is no evidence that a supervisor was involved in leaving the noose, so Cole must instead present evidence allowing a reasonable jury to find that the university was negligent—which means in this context that it failed to take 'prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.'").

Remarkably, Plaintiff admitted that he never reported any of the allegedly harassing conduct to HR or Labor Relations, *not even the supposed noose*. 1/15 PM 2 Tr., at 42. Ford *itself* initiated and conducted a thorough investigation, when a supervisor overheard discussion of the incident. *See*, *e.g.*, 1/14 PM 2 Tr., at 12, 17-18. And the mere fact that it could not determine who left the supposed noose (after Plaintiff had shipped it off site), is not enough to show that Ford failed to take reasonable steps to correct the situation. *See Cole*, 838 F.3d at 898. Indeed, there is no testimony that any of the alleged harassing conduct reoccurred. *See* 1/15 AM Tr., at 101-02 (Dahringer received no other complaints about racial objects from Plaintiff or anyone else in MP&L between 2008 and 2010).

## IV. PLAINTIFF'S RETALIATION BY SUPERVISORS CLAIM FAILS.

Plaintiff's retaliation claim fails because he offered insufficient evidence to show that he experienced any "materially adverse employment action" by his supervisors, much less that "there was a causal link between the protected activity" in which he engaged "and the adverse action." *Boss*, 816 F.3d at 918.

**A.** Here, Plaintiff contends that he was subjected to two allegedly adverse actions in retaliation for filing his discrimination complaints: (1) the supposed noose incident; and (2) staring by his supervisors. Each of these actions must be analyzed separately (*see id.* at 918 ("Insofar as Boss argues for a 'totality of the circumstances' view, the caselaw limits that approach to his hostile work environment claims.")), and neither is sufficient.

*First*, there is no evidence or testimony showing that the supposed noose incident was an action taken by *Ford*, as opposed to an unknown hourly employee. 1/15 PM 2 Tr., at 37 ("I just don't know who put it there."). Thus, Plaintiff failed to show that the incident was an adverse action "taken by [his] employer." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 404 (7th Cir. 2007).

9

*Second*, Plaintiff offered insufficient evidence to show that the supposed staring by his supervisors would "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boss*, 816 F.3d at 918. "Because Title VII does not set forth a general civility code for the American workplace, its anti-retaliation provision does not protect against petty slights, minor annoyances, and bad manners." *Id.* Staring at an employee, even in an intimidating manner, is not enough to dissuade a reasonable employee from engaging in protected activity. *See Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) ("the intimidation that Stephens allegedly suffered, which he summarily describes as being stared and yelled at, is not adequately supported by the record and is not an actionable harm"); *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) ("We do not think that being called a trouble maker, a cry baby, or a spoiled child would dissuade a reasonable person from complaining of discrimination."). And it is undisputed that Plaintiff's supervisors in the MP&L department never disciplined, coached, or counseled him after he complained about discrimination. *See* 1/16 AM Tr., at 7.

**B.** Even if the conduct about which Plaintiff complains could qualify as materially adverse actions taken by his employer, Plaintiff offered no evidence that the conduct was because of his discrimination complaints. *See Brown*, 700 F.3d at 1108 ("the plaintiffs must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have"). To begin with, Plaintiff claimed at trial that Rentschler "*already* was horrible as a supervisor" before his complaints. 1/15 PM 1 Tr., at 6 (emphasis added). Moreover, Plaintiff offered no "affirmative evidence suggest[ing] that the decision-makers were even *aware* of the [Plaintiff's] discrimination complaints before they [took the alleged adverse actions], much less that they did so intending to retaliate against the [Plaintiff]." *Brown*, 700

10

F.3d at 1108. Plaintiff engaged in arguably protected activity for the first time on August 12, 2008, when he complained to Dahringer in Labor Relations/HR. *See* 1/15 PM 2 Tr., at 2. There is no evidence in the record that any of Plaintiff's supervisors or co-workers (other than the employees who joined him in making his complaints) knew about that complaint, his CCHR charge, or the EEOC charge. *See*, *e.g.*, 1/15 PM 2 Tr., at 38 (Plaintiff testified that he never told anyone in the MP&L department that he had filed a CCHR charge); 1/15 AM Tr., at 73-74 (Dahringer did not inform any supervisor or manager about the August 12 complaint). "It is not sufficient that [plaintiff's supervisors] *could* or even *should* have known about [plaintiff's] complaints; [they] must have had actual knowledge of the complaints for [their] decisions to be retaliatory." *Luckie*, 389 F.3d at 715. Because Plaintiff offered no evidence that anyone who allegedly took adverse actions against him knew about his discrimination complaints, his retaliation claim fails as a matter of law. *See Brown*, 700 F.3d at 1108.

V. **PLAINTIFF'S PUNITIVE DAMAGES CLAIM FAILS ON MULTIPLE GROUNDS.**

Because all of Plaintiff's liability claims fail as a matter of law, the Court should also grant judgment as a matter of law on his punitive damages claims. But even if the Court submits his liability claims to the jury, it should not submit punitive damages.

A plaintiff may be awarded punitive damages only if (1) "his employer engaged in intentional discrimination with malice or with reckless indifference," meaning that the employer knew "that it may be violating federal law"; (2) "that the employee who discriminated against him was a manager, acting within the scope of his employment"; and (3) the employer does not "demonstrate a good faith attempt to establish and enforce an antidiscrimination policy." *Cooke v. Stefani Mgmt. Servs., Inc.*, 250 F.3d 564, 568 (7th Cir. 2001).

**A.** Plaintiff cannot recover punitive damages on his retaliatory hostile work environment by co-workers claim for two separate and independent reasons: (1) his co-workers were not

11

managerial employees; and (2) there is no suggestion that any coworker acted with a subjective intent to violate Plaintiff's federal rights. First, Plaintiff's only identified co-worker, Jack Stricklin, was not a managing employee—or even a supervisor. *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir. 2001) ("the fact finder ought to consider the kind of authority the employer has given the employee, the amount of discretion given to the employee in executing his job duties, and the manner in which those duties are carried out."). Second, Plaintiff never hinted that Stricklin acted with "malice" or "reckless" indifference to Plaintiff's federally protected rights when Stricklin allegedly stopped talking to him. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 530 (1999).

**B.** Plaintiff cannot recover punitive damages for his supervisor claims (discriminatory denial of overtime; race-based hostile work environment; retaliation) for several independent reasons.

*First*, Plaintiff's theory of why he should receive punitive damages is largely based on the alleged noose that he claims he found near his workstation. But Plaintiff offered no testimony or other evidence that the object was left by a supervisor. Rather, the testimony was uniformly that neither Plaintiff nor anyone else knew who left the object. *See* 1/15 PM 2 Tr., at 36 (Plaintiff testified that he had no idea how the noose got placed on the rack), 36-37 (Plaintiff testified that he had no idea who placed the noose there), 37 ("I just don't know who put it there."). As a result, Plaintiff failed to offer any evidence that the alleged noose was placed near his workstation by a managerial employee, meaning that it cannot for the basis for a punitive damages award. *See Cooke*, 250 F.3d at 568.

*Second*, Plaintiff's claims based on alleged staring by his supervisors (race-based hostile work environment, retaliation) cannot support a punitive damages award. As an initial matter,

12

the relevant supervisors do not qualify as managerial employees for purposes of punitive damages. In *Hertzberg v. SRAM Corp.*, the Seventh Circuit distinguished between the employee's immediate supervisor (Lester) and the plant manager (Margelos). *See* 261 F.3d 651, 663 (7th Cir. 2001). The immediate supervisor did not qualify as a managerial agent because his discretion was "limited"—he lacked authority to hire, terminate, or discipline employees without approval from the plant manager. *Id.* The plant manager, by contrast, "hired the staff," "took care of personnel issues and he had the authority to discipline and terminate the employment of those who worked for him, directly or indirectly." *Id.* Plaintiff has not offered any evidence to suggest that the supervisors who allegedly stared at him had anything resembling that level of authority. *See* 1/13 PM Tr., at 61 (Peace explaining that supervisors report to the superintendent, in this case "Al Ourednik").

Even if those supervisors were managerial employee, staring does not constitute reckless disregard of a federally protected right. *Kolstad*, 527 U.S. at 530. Supervisors must be allowed to supervise and monitor the work of their employees. *See Villarruel*, 266 F. App'x at 476 ("Title VII is not a code of office civility, nor does it entitle employees to *be free of demands that they accomplish more during working hours*.") (emphasis added). As *Kolstad* explained, the relevant question is not whether the employer intended to engage in particular conduct, but whether the employer knew—or was recklessly indifferent to whether—that conduct violated the law. 527 U.S. at 535 ("The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."). There is no evidence that any of Plaintiff's supervisors were recklessly indifferent to the fact that staring could violate the law—even if it would.

*Third*, Plaintiff's race discrimination claim based on denial of overtime is insufficient to support punitive damages for similar reasons. Again, Plaintiff premises this claim primarily on the conduct of his supervisor, Rentschler. But there is no evidence that Rentschler was a managerial employee for purposes of punitive damages. To the contrary, the evidence showed that Rentschler reported to Ourednik and was managed indirectly by Grzych. 1/13 PM Tr., at 61. Indeed, Plaintiff's own witness testified that Rentschler had *no* authority to assign weekend overtime—"[w]hen it came to overtime on the weekends, it actually had to go through Ourednik." 1/16 AM Tr., at 34.

*Finally*, even if punitive damages were otherwise appropriate, there is no evidence in the record suggesting that Ford did not "demonstrate a good faith attempt to establish and enforce an antidiscrimination policy." *Cooke*, 250 F.3d at 568. The evidence is entirely to the contrary—Ford not only *had* written antiharassment and antidiscrimination policies, it *implemented* them reasonably and in good faith. For example, the undisputed evidence showed that: (1) Ford had a zero tolerance antiharrassment policy, (1/14 AM 1 Tr., at 11); (2) employees knew about Ford's zero tolerance antiharassment policy, which they were taught about in orientation and then through periodic trainings (*id.*); (3) employees could bring concerns to the labor relations office before shift, after shifts, during shifts (1/14 PM 2 Tr., at 45); and (4) Plaintiff testified that he signed Ford's antiharassment policy to acknowledge that he received it and knew, from the time he started working at Ford, that if he had any problems the labor relations office could address them (1/15 PM 1 Tr., at 57-58).

The evidence also showed that Ford investigated allegedly discriminatory conduct in good faith. Ford *itself* initiated the investigation into the alleged noose. 1/14 PM 2 Tr., at 12.

14

And Plaintiff's own witness, Carline Dunlap, admitted that Dahringer came down to the plant floor to look around at the time of the alleged noose incident. 1/16 AM Tr., at 82.

The evidence of Ford's good faith efforts is materially indistinguishable from the situation in *May v. Chrysler*, 716 F.3d 963 (7th Cir. 2013). "To be sure, Chrysler could have done more to stop the harassment. But given the situation that it faced—an anonymous harasser, an assembly plant covering four million square feet, and a three-shift-a-day operation, Chrysler's response was enough *as a matter of law* to avoid punitive damages liability." *Id.* at 975-76 (emphasis added). So too here. With respect to the alleged noose, Ford faced an anonymous harasser, who allegedly left an object one time—for a few minutes—in a huge assembly plant with thousands of employees arranged across multiple shifts. Plaintiff's insistence that Ford could have done more to find out who left the alleged noose near his workstation—after *he* shipped it off site without reporting it to Ford—is entirely unreasonable. But even if Ford "could have done more to stop the harassment," its good faith efforts shield it from punitive damages as a matter of law. *Id.* at 976; *see also Fuller v. Caterpillar, Inc.*, 124 F. Supp. 2d 610, 617-18 (N.D. Ill. Oct. 4, 2000) (concluding that the employer's good faith efforts precluded punitive damages liability given generally acknowledged antiharassment policy and reasonable steps it took to rectify the situation); *Wash. ex rel Wash. v. DeYoung*, No. 03 C 3161, 2004 WL 1718448, at *7 (N.D. Ill. July 29, 2004) (granting summary judgment on of punitive damages because it was undisputed that the employer had a posted antidiscrimination policy and provided training on the policy); *Hull v. APCOA/Standard Parking Corp.*, No. 99 C 2832, 2000 WL 198881, at *14 (N.D. Ill. Feb. 14, 2000) ("employer's good faith can be established by the dissemination of a written non-discrimination and anti-harassment policy with an effective reporting mechanism").

## CONCLUSION

The Court should grant judgment as a matter of law on all of Plaintiff's claims.

Dated: January 20, 2020

Respectfully submitted,

**BERKOWITZ OLIVER LLP**

By: /s/ Blaine H. Evanson_____

    Kathleen M. Nemecheck    ARDC #50139
    Jocelyn A. Villaneuva   *Admitted Pro Hac Vice*
    2600 Grand Boulevard, Suite 1200
    Kansas City, Missouri 64108
    Telephone: (816) 561-7007
    Facsimile: (816) 561-1888
    E-Mail: knemecheck@berkowitzoliver.com
            jvillanueva@berkowitzoliver.com

    Mark H. Boyle    ARDC #6200934
    Karen Kies DeGrand    ARDC #6191140
    Curtiss Schreiber
    Donohue Brown Mathewson & Smyth LLC
    140 South Dearborn Street, Suite 800
    Chicago, Illinois 60603
    Telephone: (312) 422-0900
    Facsimile: (312) 422-0909
    E-Mail: mark.boyle@dbmslaw.com
            karen.degrand@dbmslaw.com

    Blaine H. Evanson   *Admitted Pro Hac Vice*
    Gibson, Dunn & Crutcher LLP
    3161 Michelson Drive
    Irvine, California 92612
    Telephone: (949) 451-3805
    Facsimile: (949) 475-4768
    E-Mail: bevanson@gibsondunn.com

    *Attorneys for Defendant Ford Motor Company*

...

**CERTIFICATE OF SERVICE**

  I hereby certify that on January 20, 2020 the foregoing was filed with the Court using the ECF system, which provided electronic service to the following:

David Porter
Law Office of David Porter
33 N. LaSalle Street
Suite 2000
Chicago, IL 60602
Telephone: (312) 236-1207
E-Mail: dporterlaw@ameritech.net

Karen J. Doran
Karen J. Doran, Attorney at Law, LLC
2100 Manchester Road, Suite 1620
Wheaton, Illinois 60187
Telephone: (630) 384-9367
E-Mail: karen@karendoranlaw.com

*Attorney for Plaintiff David Rogers*

            /s/ Blaine H. Evanson
            ***Attorney for Defendant Ford Motor Company***